[No. S029489. Feb. 4, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ALPHONSO HOWARD, Defendant and Appellant.

COUNSEL

Lynne S. Coffin, State Public Defender, Andrew S. Love and Alison Pease, Deputy State Public Defenders; and David S. Adams, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—Defendant Alphonso Howard was sentenced to death after a jury convicted him of first degree murder, rape, and a forcible lewd act upon a child under the age of 14. The jury found that he personally used a firearm during the offenses,[1] and that he caused bodily injury to the child while committing the lewd act.[2] The special circumstances supporting the imposition of the death penalty were that the rape and forcible lewd act upon a child occurred while defendant committed the murder.[3] We affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

##### a. *Wendy's disappearance*

Eleven-year-old Wendy Bustamante lived with her parents, Carlos and Soila Bustamante, in Compton. On April 2, 1988, at 4:30 p.m., Wendy went outside to play. Five minutes later, Mrs. Bustamante realized she was missing and began searching for her.

One of Wendy's playmates was K., defendant's younger sister. K. and their mother, Mary Williams, lived several doors down from the Bustamante family. Mrs. Williams called the police for Mrs. Bustamante, who did not speak English.

---

[1] Penal Code sections 1203.06, subdivision (a)(1)(A) and 12022.5, subdivision (a). Statutory references are to the Penal Code unless otherwise stated.

[2] Section 1203.066, subdivision (a)(2).

[3] Section 190.2, subdivision (a)(17)(C), (E).

Defendant had a room in the back of a converted garage located on Mrs. Williams's property, but detached from her house.

b. *The investigation and defendant's statements*

Defendant made five statements to the police. He began by denying any involvement in the disappearance.

On April 3, the day after Wendy was reported missing, Officer Louis Mendez interviewed defendant as part of the ongoing investigation of the disappearance. Defendant said that Wendy had come to the Williams residence seeking $5 in payment for earrings she had sold defendant's mother.[4] Mrs. Williams was not home, so defendant gave Wendy $3 and told her to come back later to see Mrs. Williams for the balance. Wendy left. Defendant did not say whether he had seen her again.

On the morning of April 4, Detective Gilbert Cross interviewed defendant and his family. Defendant repeated that he had paid Wendy $3 for the earrings and added that he had not seen her again.

That same morning, after defendant's statement to Detective Cross, Wendy's father found her body in a vacant garage. When Mr. Bustamante climbed through a loosely boarded window, he tripped over Wendy's body in the darkness. Thinking she might still be alive, he removed a ball of black material from her mouth and ran to summon the police. The vacant garage was separated from defendant's room by a low brick wall. Marks consistent with the dragging of a body led from the wall to the garage.

On April 5, defendant was arrested and waived his *Miranda*[5] rights in writing. He told Detective Cross that he had seen Wendy on April 2, between 4:00 p.m. and 4:30 p.m., while she was playing with his sister, K. Wendy told him his mother owed her $5 for a pair of earrings. Defendant gave her $3 and said he would not have the rest until his mother returned from work. Wendy continued to play with K. and defendant paid little attention to them.

Fifteen minutes after paying Wendy, defendant took his mother's car in for servicing.[6] He returned home, then walked to his friend Desron Kimbell's

---

[4] The record is in conflict as to who sold the earrings to whom. Mrs. Bustamante testified that she sold the earrings to K. and that K. owed her for them. Mrs. Williams and K. testified that Wendy sold the earrings to Mrs. Williams, and that Mrs. Williams told Wendy she would pay her for them after she came home from work on Saturday, the day Wendy disappeared.

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

[6] Originally, defendant told Detective Cross he had done so *before* giving Wendy the money.

house. Mr. Kimbell was not present, but defendant stayed at the house for an hour, having a drink with Kimbell's brother, Anthony. Later, defendant and his mother went to visit his brother, Richard. They returned home at 11:00 o'clock that evening and he went to bed.

Detective Cross told defendant he did not believe him. Defendant was silent for 30 or 40 minutes. During that time he did not request counsel or decline to talk anymore. Finally, defendant asked Cross for shoes to replace those that had been taken from him for comparison with footprints found in the garage. When Cross gave him some shoes, defendant began to cry and asked Cross, "What do you want to know?" Cross replied, "Start from the beginning and tell me what happened."

Defendant then told Cross a story that implicated his friend Desron Kimbell. He said Wendy came to his room about 5:00 p.m. and asked for the remaining $2. Wendy entered the room, and as defendant started to lock the door, Kimbell arrived. Kimbell came in and locked the door. The men, who were already high on marijuana, drank malt liquor. Defendant told Wendy to take off her clothes. Wendy was unwilling, but complied when the men "raised their voices." Defendant said, "I told her to get on the bed and I got on her." Defendant accomplished intercourse, but did not ejaculate. Defendant dressed, and Kimbell began touching Wendy's breasts. Defendant went to his mother's house. When he returned 10 minutes later he saw a small black and silver revolver on the bed. Wendy's body was in the closet with something in her mouth. Defendant knew she was dead, although he had not heard a shot. As Kimbell began to tie her hands, defendant asked what happened. Kimbell responded, "She wouldn't shut up."

They bound Wendy's body in an old sheet and Kimbell suggested hiding it in the vacant garage. Defendant knew a board covering the garage window was loose. While they were moving the body defendant thought he heard someone coming. He told Kimbell to go ahead while he checked the noise. Minutes later Kimbell told him he had put the body in the garage. They disposed of the carpet from defendant's closet floor in a trash bin in a nearby park. Kimbell took the gun; defendant did not know what became of it. While Wendy was still alive, defendant took her gold necklace and put it in his dresser drawer.

Cross prepared a written account of defendant's statement, which defendant signed.

After further investigation, Detective Cross told defendant his mother and sister did not remember seeing Desron Kimbell that day. Defendant retracted his previous statement insofar as it involved Kimbell. He now said, "Desron didn't have nothing to do with this." Defendant gave a final *Mirandized* statement that was videotaped.

According to this version, Wendy returned to defendant's room at 5:30 p.m. He and the 11 year old had consensual sexual intercourse and he did not ejaculate. Defendant's Colt .380 "was on the table all the time" and Wendy might have seen it. As he was putting the gun in his drawer, it went off accidentally, striking Wendy. The safety was off and the hammer cocked because earlier in the day he had fired the gun at a refrigerator in the yard. Before the shooting, Wendy let defendant wear her gold necklace. After the shooting, he put the necklace in his dresser.

Defendant went outside to check whether anyone had heard the shot. Satisfied that no one had, he went back to the room "to see if she was breathing or not." He put a black "head rag" in or on Wendy's mouth, tied her hands, and bundled her into a sheet. He knew the garage on the adjoining lot was vacant and that the board covering the window was loose. After dark he hid Wendy's body there. He threw the gun into the ocean.

### c. *The forensic evidence*

Criminalist Heidi Robbins examined the garage where Wendy's body was found. The clothed body was wrapped in newspaper and then a sheet, which was knotted at both ends. In Ms. Robbins's opinion, the sheet was knotted so that it could be used as a sling to carry the body. Wendy's hands were tied behind her back. A damp, wadded-up paper bag was found stuffed into her mouth, possibly as a gag. A black "head cap" or scarf was wrapped tightly around Wendy's face and covered her mouth.

Seminal fluid matching defendant's DNA was recovered from Wendy's vagina. Under the "ceiling" method of calculation, the likelihood of a match was 1 in 980,000. Defendant's fingerprints were found on the newspapers that lined the sheet containing Wendy's body.

The cause of death was a gunshot that passed through Wendy's heart, liver, and aorta, finally lodging in her spine. Soot particles around the rim of the entrance wound indicated that the muzzle of the gun had been pressed against Wendy's blouse. Whether Wendy's hands were tied before or after her death was not determined. There was hemorrhaging or internal bleeding at the entrance of her vagina, consistent with sexual intercourse.

The extent of the hemorrhaging at Wendy's vaginal entrance was disputed. The coroner characterized it as "minor" or "minimal." However, Dr. Carol Berkowitz, a professor of pediatrics who specialized in child abuse cases, reached a different conclusion. Having reviewed the autopsy report and examined the coroner's photographs, Dr. Berkowitz described the hemorrhaging as "moderate to severe." "[M]ost often in the case of a sexual assault you

see small microscopic injuries that are difficult to see without assistance. It is distinctly unusual . . . to see this degree of injury following a sexual assault [upon a child]." In Dr. Berkowitz's opinion, the injury was caused by "blunt force trauma," by which she meant that it was a "collision-type injury, a collision between two bodies and two tissues." This type of injury would be consistent with rape.

Pursuant to a warrant, Detective Cross searched defendant's room. In defendant's dresser he found Wendy's gold chain and a holster for a small-caliber pistol, like a .380. In the yard outside defendant's room Cross found a shell casing near a refrigerator. The shell casing was compared with a bullet recovered from Wendy's body. Both were .380-caliber, but without a gun to test fire, the firearms expert could not say more. A pubic hair removed from Wendy's left middle finger was physically and microscopically similar to a pubic hair taken from defendant.

### d. *The question of Desron Kimbell's involvement*

Both the prosecutor and defense counsel gave opening statements at the outset of the trial. In her opening statement, defendant's attorney said, without elaboration, "there is evidence that will suggest that [Desron Kimbell] may have been involved in this incident."

As earlier noted, defendant gave contradictory statements regarding Kimbell. In his third statement to Detective Cross, defendant claimed that Wendy was shot while she was alone in defendant's room with Kimbell. However, in his fourth and final statement to Cross, defendant asserted, "Desron didn't have nothing to do with this."

Defendant's sister K. placed Kimbell at the scene of the crime. K. testified that while she was playing outside the garage, defendant told her to go to the store for change so he could pay Wendy what Mrs. Williams owed her. When she left, Wendy remained and Kimbell was in defendant's room.

Kimbell was arrested for Wendy's murder on April 6, after defendant implicated him. When arrested Kimbell wore a bloody T-shirt and blood-spotted sneakers. He had an alibi covering the time in question and an innocent explanation for the blood on his clothes. His testimony was supported by that of his mother, Gwendolyn Myles, and his friend, Jerome Govan, an employee of the Los Angeles County Probation Department. Forensic evidence also pointed to his innocence.

Kimbell was called by the prosecution and testified that when Wendy was murdered he was watching televised basketball games with Jerome Govan.

They started watching the two games at 1:00 p.m. When the second game was over, sometime after dark, Govan gave him a ride home. Kimbell's mother testified that he spent the day at Govan's house.

Jerome Govan testified that he and Kimbell watched two basketball tournament games at his home that day. It was stipulated that the games started at 2:30 p.m. and 4:30 p.m., respectively. Kimbell did not leave Govan's home until 8:00 p.m.

Kimbell provided the following explanation for his bloodstained clothes: The day after Wendy's murder he got into a fight with a friend named Lee Clayton. A police officer breaking up the fight "busted me in the head with a billy club. And that is how I got the blood all over me." His mother took him to a Kaiser hospital for stitches. Jerome Govan was present during the fight. Defendant's mother and Govan corroborated Kimbell's testimony on this point.

No DNA evidence linked Kimbell to the crime. The DNA on Wendy's vaginal swab did not match Kimbell's. His fingerprints did not match those found on the newspapers that lined the sheet containing Wendy's body. DNA testing established that the blood on Kimbell's shoes could have been Kimbell's, but not Wendy's. Kimbell gave no testimony about defendant, his activities, or whereabouts on the day of the murder.

### 2. Defense Evidence

The defense re-called Detective Cross and established that he arrested Kimbell based on defendant's statement implicating him. Kimbell told Cross that he went to his friend Jerome's house about 9:00 a.m. or 10:00 a.m. the day Wendy was murdered. His account of their activities earlier in the day differed somewhat from his trial testimony. He told Cross they had driven to Long Beach, played basketball, and returned to Jerome's between 5:30 p.m. and 6:00 p.m. He said they watched basketball on television until 8:00 p.m., when Jerome drove him home. On cross-examination, Detective Cross testified that Kimbell was calm and exhibited none of the anxious behavior that in Cross's experience suspects tend to display when lying.

In addition to the T-shirt Kimbell was wearing when arrested, a second bloodstained T-shirt was found in his room. The rest of the defense case was devoted to trying to demonstrate that there was confusion about which of the T-shirts was tested for blood type. However, in her closing argument to the jury, defense counsel made no reference to this issue.

Defense counsel's closing argument regarding Kimbell boiled down to the bare assertion that he was "a fact in this case."

B. *Penalty Phase*

1. *Prosecution Evidence*

The prosecution established that in the three years before Wendy's murder defendant had committed an assault and a burglary. While incarcerated awaiting this death penalty trial he also committed two assaults, a robbery, and an attempted extortion, and he possessed a "shank."

a. *The assault on Maria Velez*

Maria Velez lived across the street from defendant and had known him a long time. On September 10, 1985, he knocked on her door, holding a pair of pliers. Ms. Velez knew he had borrowed pliers from her husband, so she assumed he was returning them. When she opened the door defendant grabbed her, pulled a gun, and tried to push her back into the house.[7] As Ms. Velez broke free, defendant pulled her blouse off, severely bruising her arms. Ms. Velez ran outside screaming to her neighbor, Maurelio Sanchez. Mr. Sanchez armed himself and entered Ms. Velez's house. He saw a gun on the floor and the shadow of a man running outside the back door. In the house the investigating officer found pliers and a BB gun that looked like a .45-caliber automatic.

b. *The burglary of the Dodson residence*

On January 10, 1987, Virginia Dodson returned home to find that her videocassette recorder was missing. Defendant stipulated that he was convicted of burglarizing the Dodson residence.

c. *The assault and robbery of Lorenzo Lewis*

On January 10, 1990, Lorenzo Lewis was in a Los Angeles County jail cell with defendant and others. Someone said Lewis belonged to the Bloods gang. Defendant asked if it was true. Lewis denied it, but defendant hit him in the left eye, causing permanent scarring. Defendant also took money from Lewis's pocket. After Lewis reported the incident, two sheriff's deputies saw small cuts on his left eye and cheek.

d. *Attempted extortion of La Wong Ellison*

On October 29, 1990, defendant told La Wong Ellison, another county jail inmate, that "they" were going to "jack" him. Ellison understood "they" to refer to defendant's "homies." Defendant said he could prevent the attack if

---

[7] Ms. Velez did not see the gun, but she felt it when he pressed it against her.

Ellison paid him. Defendant admitted to Deputy Sheriff Steven Johnson that he told Ellison that people intended to rob him.

### e. *Possession of a deadly weapon in jail*

On January 30, 1992, Deputy Sheriff Gary Gerlach discovered a makeshift knife, or "shank," in defendant's mattress. The shank was a long metal screw filed to a point, with plastic and cloth melted around it to serve as a handle. Defendant was in a single cell he had been occupying for a month. Everything in the cell, including the mattresses, would have been searched before he was housed there. The bunk was six feet inside the cell, so it would have been impossible for anyone to reach inside and hide the shank in the mattress. Jail security procedures made it unlikely that another inmate could have entered the cell. Two thin foam mattresses, one on top of the other, a total of two inches of foam padding, were on defendant's metal bunk. The shank was hidden inside a slit in the middle of the top mattress, so "[s]omebody laying [*sic*] on that would have definitely felt it."

### f. *Assault on Manuel Toscano*

On May 14, 1992, inmate Manuel Toscano was assaulted by defendant and two other men who accused him of stealing their candy. Hector Camarena, a jail inmate, saw the assault and told the guards. Toscano received medical treatment for a bloody nose, a bloody mouth, and a black eye. Deputy Sheriff Ronald Smith interviewed defendant and the other two suspects. One of the others told Deputy Smith that the "esse," a slang term for "Hispanic," had taken his candy.

### 2. *Defense Evidence*

### a. *The testimony of defendant's family*

Defendant's mother Mary Williams had nine children by four men by the time she was 29. Defendant, her first child, was born when she and the father, Jesse Howard, were 15. Five of Mrs. Williams's other children were fathered by Jeffrey Williams. Mrs. Williams lived with him periodically from the time defendant was two until he was 15.

Mr. Williams would frequently get drunk and fight with Mrs. Williams. At the age of six or seven defendant was too young to protect his mother, so he would sneak out of the house, sometimes at night, and walk a mile to his maternal grandmother's house for help. Mr. Williams physically abused defendant, once trying to whip him with an extension cord. When Mrs. Williams grabbed the cord Mr. Williams started fighting with her.

When not living with Mr. Williams, Mrs. Williams and her children resided with her mother and father, the Greens. Four of the Greens' own children were still at home at that time, so there were eight children in the two-bedroom house. Mr. Green had a good relationship with both Mrs. Williams and defendant. One of Mrs. Williams's adult brothers once tied defendant's hands and feet and beat him with a fan belt, raising welts on his back and legs. Mrs. Williams called the police, which angered her mother.

While awaiting trial defendant wrote affectionate letters to his mother; when they spoke on the phone he always asked about his siblings. His oldest sister and a younger brother visited him and stayed in touch by mail.

### b. *The testimony of Dr. James Bush*

Dr. James Bush held a doctorate in social work, was a professor in the California State University system and also maintained a private practice. He was retired from the Los Angeles County Department of Mental Health, the Charles Drew Medical School, and Martin Luther King, Jr., hospital. Dr. Bush interviewed defendant and his mother twice. He also interviewed Mrs. Green and defendant's siblings. He reviewed defendant's probation file and school records, along with the welfare files of defendant's mother and her parents, the Greens.

Dr. Bush noted that it is very difficult for a young mother to carry out her parenting responsibilities while still a child herself. This would be especially true if the mother were to have nine children in 14 years. Mrs. Williams remained dependent on her parents as well as on the welfare system. The Greens, in turn, were also dependent on welfare because Mr. Green was disabled by arthritis. At one point Mrs. Williams was living with the Greens in their two-bedroom home along with her seven children, two of her uncles, and others. On one occasion, two of defendant's siblings were removed by the authorities from Mrs. Williams. She later took parenting classes.

Though Mrs. Williams told Dr. Bush that defendant had no serious illness, in fact he suffered from anemia and asthma. Defendant received B's and C's in the ninth and 10th grades, but earned failing grades the next year.

Defendant's father, Jesse Howard, wanted to marry defendant's mother, but her parents prevented it. They also prevented Mr. Howard from having any contact with defendant as a child. Mr. Howard managed to establish contact with defendant as he grew older. When defendant was 16, a probation officer reported that he would have recommended that defendant be returned to camp but for his father's "genuine concern regarding his son's future." When defendant was in juvenile hall, Mr. Howard would visit. He told

defendant's probation officer that he wanted defendant to come live with him in Washington State and that his wife was completely supportive. Defendant did spend several summers with his father, a self-employed mechanic, and his stepmother, a transit authority bus driver. Defendant said he left their home because he saw Mr. Howard using phencyclidine, but Mr. Howard thought it was because defendant was young and homesick.

On direct examination, Dr. Bush questioned the generally positive picture defendant, his mother, and grandmother painted of their family life. However, on cross-examination, Dr. Bush admitted he did not have any information to prove or disprove their descriptions.

#### c. *The testimony of Wendy's principal*

Peter Thomas Danna, Jr., was the principal of the elementary school Wendy attended. She was "a little ahead" of girls her age in terms of physical maturity. Her reading and math scores were not at grade level. However, Wendy demonstrated leadership potential, and Mr. Danna anticipated that she might soon have become a class or student body president.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Notice of Aggravating Evidence*

Defendant contends the notice of aggravating evidence involving certain crimes he committed while in jail was statutorily defective and violated his rights under the federal Constitution. (U.S. Const., 5th, 6th, 8th, 14th Amends.; § 190.3.)

 Section 190.3 bars presentation of any evidence in aggravation, except when offered in rebuttal, "unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial."

On June 21, 1991, nearly a year before jury selection began, the prosecutor filed a notice of penalty phase evidence pursuant to section 190.3. The notice did not include any misconduct by defendant in jail.[8]

---

[8] Rather, it included two of the six incidents that were eventually admitted as aggravating evidence, namely, the assault on Maria Velez and the burglary of the Dodson residence. (See, *ante*, at p. 1011.)

On June 3, 1992, jury selection began.

On June 5, the prosecutor conducted a computer search and became aware for the first time of violent acts defendant committed while incarcerated. She gave defense counsel a computer printout of this information the same day.

On June 15, the jury was sworn.

On June 16, the prosecutor orally advised the court that she intended to introduce in the penalty phase "four incidents of criminal behavior in the jail."

On June 18, defendant's public defender objected to the introduction of 18 additional jailhouse incidents of which she had been informed by the prosecutor only the day before. Defendant's attorney told the court: "If counsel is now saying there are some 18 other incidents she may be bringing up, I haven't investigated those; I am not ready. I would have considered how I picked a jury if I knew about all this stuff. I haven't even received all the material yet. I don't know who these potential witnesses are or their criminal background[s]. And probably the thing that is the biggest sense of urgency for me right now is if you have got some 18 incidents from jail and a bunch of jail inmates, you are going to hit other public defender clients and I am going to end up in a conflict situation . . . ." Defense counsel argued that defendant would be prejudiced, being forced to start all over again with new counsel, if she had to withdraw because of conflicts.

The court commented that defense counsel had received notice.

Defense counsel replied: "All right. As far as notice, I was given a two-page printout with like three or four names about June 3rd [*sic*]—I can't remember when—and I started checking on those names. But what counsel is now saying, she is going to give me a whole lot *more* names . . . ." (Italics added.)

The court responded to defense counsel's concerns by advising the prosecutor: "[W]hatever you have now, that is what you are stuck with. No further investigation. No other names will be added to the list." Defense counsel asked, "Can I assume . . . there would not be any other witnesses that I need to worry about in terms of a conflict or them testifying in this case?" The court responded, "That is my ruling." Defense counsel thanked the court.

The four jail incidents eventually introduced into evidence at the penalty phase were the same four incidents of which defendant was informed on June

5, not any of the 18 additional incidents raised by the prosecution at the June 18 hearing. Defendant does not contend otherwise.

Defendant's failure to object to the notification of these four incidents on June 5, or during the prosecution's subsequent effort to introduce the 18 additional incidents, bars him from challenging the adequacy of the notification on appeal. (*People v. Medina* (1995) 11 Cal.4th 694, 771 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

Moreover, the purpose of the notice requirement is to allow a defendant sufficient opportunity to prepare a defense to the aggravating evidence. (*People v. Blair* (2005) 36 Cal.4th 686, 751 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; *People v. Smith* (2003) 30 Cal.4th 581, 619 [134 Cal.Rptr.2d 1, 68 P.3d 302] (*Smith*).) Here, defendant had ample opportunity to prepare. The penalty phase trial began on July 20, 1992, more than a month and a half after he received notice of the four jail incidents.

Defendant counters that the prosecution's failure to inform him of this evidence until after jury selection had begun prejudiced his ability to conduct an effective voir dire. This argument rests on a false premise. "The purpose behind the notice requirement . . . is to permit the defendant to prepare a defense at the penalty trial, not to question prospective jurors about every bit of evidence they might hear. Defendant's argument would mean that no evidence discovered after the beginning of trial would ever be admissible, which is not the law." (*Smith, supra*, 30 Cal.4th at p. 620.)

## 2. Wheeler/Batson *Motions*

 Defendant contends that the prosecutor exercised three peremptory challenges on racial grounds, in violation of his right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution, and his right to equal protection under the Fourteenth Amendment to the United States Constitution. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 97 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).)[9] The dispositive question here is whether defendant made a prima facie case of group bias. To do so, the defendant must make a " 'showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410] (*Johnson*); see also *People v.*

---

[9] We do not treat defendant's federal claim as waived by his failure to raise it below because the state and federal standards and the factual inquiry are essentially the same. (*People v. Panah* (2005) 35 Cal.4th 395, 438, fn. 13 [25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

*Bonilla* (2007) 41 Cal.4th 313, 341 [60 Cal.Rptr.3d. 209, 160 P.3d 84] (*Bonilla*).) Where, as here, it is not clear whether the trial court used the reasonable inference standard, rather than the recently disapproved " 'strong likelihood' standard," we review the record independently. (*Bonilla*, at p. 342.) We have done so here. Defendant fails to meet the reasonable inference standard.

Defendant is an African-American. The peremptory challenges in question were to: (1) P.T., an African-American woman, (2) A.A., a Hispanic man, and (3) D.M., an African-American man. The court expressly found there was no prima facie case of discrimination against P.T. or D.M. It impliedly, but nonetheless clearly, found there was no prima facie case of discrimination in the excusal of A.A.

The prosecutor excused eight potential jurors: four Caucasians, two African-Americans, one Hispanic, and one Asian-American. The jury as sworn, including alternates, was comprised of eight African-Americans, five Hispanics, three Caucasians, one Asian-American, and one person of mixed race.

Defense counsel objected to the exclusion of Prospective Juror P.T. solely on the ground that both P.T. and defendant were African-Americans. The prosecutor pointed out that she had excused three prospective jurors and P.T. was the first African-American excused. She argued, "There has been no prima facie showing of a pattern of discrimination on the excuse of one person, particularly one who indicated so much reluctance to follow the court's instructions." Defense counsel asked that the prosecutor state her reasons for challenge. The prosecutor responded by asking the court to rule, first, on whether a prima facie case of discrimination had been made. The court ruled the defense had *not* made a prima facie case. It characterized the motion as "groundless" and as supported by "no reason at all." The court observed that the prosecutor had at that point excused "one female Caucasian [and] one male Japanese."

█ Both the prosecutor and the court referred to Prospective Juror P.T.'s apparent reluctance to follow the law as stated by the court. The prosecutor was referring to an answer that P.T. gave on the juror questionnaire. Question No. 89 asked, "If the judge gives you an instruction in law that you feel is different from a belief or opinion that you have, how will you deal with that conflict?" P.T. responded, "My opinion is important to me, so I would talk to the judge. We will have an [*sic*] discussion about the differences we have[,] to come to some agreement." On voir dire, the court pursued the matter at some length. The exchange left the court feeling that P.T. "didn't want to follow the law" and was "arrogant, flippant." We note that the court resolves legal questions and does not negotiate them with individual jurors.

Defense counsel next objected to the excusal of Prospective Juror A.A. She noted that A.A., a 19-year-old Hispanic male, was a "person of color." The court observed, "I don't know what you are talking about, but I am going to let [the prosecutor] respond to this." Defense counsel repeated her concern that the prosecutor was exercising her peremptories on the basis of race. The court noted that before the prosecutor challenged A.A., "she excused a female Caucasian, male Japanese, female [B]lack, male [W]hite, [and] a female Caucasian . . . ." The court asked the prosecutor, "Do you want to respond?" Apparently, the jury pool was quite diverse. The prosecutor noted that because the panel was largely comprised of ethnic minorities, any peremptory challenges would likely be made to minorities. The prosecutor continued, "I don't think I have to make the showing. I don't think the court has made the finding that there is a prima facie pattern. In fact, the court's finding is to the contrary. [¶] But I will be happy to put on the record—" The court interjected, "Please put the court and the defense counsel at ease here." In this context the court did not make a finding of prima facie discrimination, but accepted the prosecution's offer to make a record.

When the trial court expressly states that it does not believe a prima facie case has been made, and then invites the prosecution to justify its challenges for the record on appeal, the question whether a prima facie case has been made is not mooted, nor is a finding of a prima facie showing implied. (*People v. Welch* (1999) 20 Cal.4th 701, 746 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Turner* (1994) 8 Cal.4th 137, 167 [32 Cal.Rptr.2d 762, 878 P.2d 521].) Under such circumstances, we sustain the trial court if, upon independently reviewing the record, we conclude the totality of the relevant facts does not give rise to an inference of discriminatory purpose. (*Johnson, supra,* 545 U.S. at p. 168.)

Here, the trial court did not expressly rule that defendant had failed to make a prima facie case. However, by reciting the races of the prospective jurors excused by the prosecutor, the court clearly implied that a prima facie case of discrimination had not been made.[10] We agree it had not been.

The voir dire here provided the prosecutor with ample grounds for reasonably challenging A.A. Two of the prosecutor's concerns, with which

---

[10] Defendant contends the trial court improperly required defendant to show a pattern, rather than a single instance, of discrimination. The exercise of even a single challenge based on race is constitutionally proscribed. (*Bonilla, supra,* 41 Cal.4th at p. 343.) However, the existence of a discernible pattern in the use of challenges remains a factor a court may consider when determining whether a prima facie showing has been made. The challenge of one or two jurors, standing alone, can rarely suggest a pattern of impermissible exclusion. (*Ibid.; People v. Bell* (2007) 40 Cal.4th 582, 598 [54 Cal.Rptr.3d 453, 151 P.3d 292].) Because defense counsel provided no other basis for inferring discriminatory intent, the absence of a pattern was significant here.

the court ultimately agreed, were that A.A.'s answers on the juror questionnaire revealed a flippant attitude toward the proceeding and suggested he was trying to avoid jury service. Question No. 60 asked prospective jurors for their thoughts about, among others, prosecutors and defense attorneys. A.A. wrote that prosecutors "are trickly [*sic*] people," and that defense attorneys "will say anything." Question No. 82 asked whether the prospective jurors had any problems that "might interfere with your ability to concentrate on the case or might cause you to 'hurry-along' your deliberations." A.A. checked "Yes." He explained: "I'm a student and this is my summer vacation . . . . I want to have fun and relax and not think about school."

On voir dire, the prosecutor asked A.A., "I kind of had the impression that you enjoyed writing about prosecutors and defense attorneys and all with an eye towards . . . the fact that you would rather not serve on a long case. [¶] Am I right about that?" A.A. answered yes, although he went on to say that if selected, he would not, in fact, rush to judgment. The prosecutor pursued the point. "[Prosecutor]: So you are sort of having fun with us a little? [¶] [A.A.]: Sort of. [¶] [Prosecutor]: Letting us know you would rather have fun this summer? [¶] [A.A.]: Yeah."

The court agreed with the prosecutor. "I found [A.A.] to be . . . flippant in his answers on his questionnaire. He was trying to get off the jury panel."

■ Finally, defense counsel asserted that the prosecutor had challenged Prospective Juror D.M., an African-American man, on the basis of his race. The court ruled that defense counsel had not made a prima facie showing. The court noted that D.M. was one of six prospective alternates and that four of the six were persons of color: three African-Americans and one Hispanic. The court also observed that D.M. declined to fill out substantial portions of the jury questionnaire, marking "confidential" on "almost all of his answers." Again, upon an independent review of the record, we find no error. An advocate may legitimately be concerned about a prospective juror who will not answer questions.

■ We decline defendant's invitation to engage in comparative juror analysis. Like *Bonilla, supra,* 41 Cal.4th 313, this is a "first-stage" *Wheeler/Batson* case, in that the trial court denied defendant's motions after concluding he had failed to make out a prima facie case. It is not a "third-stage" case, in which a trial court concludes a prima facie case has been made, solicits an explanation of the peremptory challenges from the prosecutor, and only then determines whether defendant has carried his burden of demonstrating group bias. "We have concluded that *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] does not mandate comparative juror analysis in these circumstances (*People v. Bell, supra,* 40 Cal.4th at p. 601), and thus we are not compelled to conduct a

comparative analysis here. Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use where the analysis does not hinge on the prosecution's actual proffered rationales, and we thus decline to engage in a comparative analysis here." (*Bonilla*, at p. 350.)

We have encouraged trial courts to ask prosecutors to give explanations for contested peremptory challenges, even in the absence of a prima facie showing. (*Bonilla, supra*, 41 Cal.4th at p. 343, fn. 13.) We emphasize that if a court ultimately concludes that a prima facie showing has not been made, the request for and provision of explanations does not convert a first-stage *Wheeler/Batson* case into a third-stage case.

Defendant's claim that the trial court did not make "a sincere and reasoned effort" to evaluate the nondiscriminatory justifications proffered by the prosecutor[11] is unsupported by the record.

### B. *Guilt Phase Issues*

#### 1. *Flight Instruction*

■ The jury was instructed that evidence of flight alone is insufficient to establish guilt, but may be considered along with other facts in deciding the question of guilt or innocence. (See CALJIC No. 2.52.) The giving of such an instruction is statutorily required when flight evidence is relied upon by the prosecution. Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. [¶] The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

Defendant contends there was no factual basis for the instruction, so it violated his rights under the federal and California Constitutions to due process of law and a fair trial. (U.S. Const., 6th, 8th, 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.)

The instruction is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt. (*People v. Visciotti* (1992) 2

---

[11] See, e.g., *People v. Jackson* (1996) 13 Cal.4th 1164, 1197 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (*Jackson*).

Cal.4th 1, 60 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Such an inference was reasonable here. After Wendy's body was discovered in the vacant garage across the wall from his room, defendant did not come home that night or the next day. At nearly midnight on the second evening he was arrested at his aunt's house.

Defendant objects that the flight instruction was nevertheless improper because he had remained at home for two days after Wendy disappeared. Certainly the discovery of Wendy's body was a significant new development. Further, by its own terms, section 1127c addresses instances in which flight is not immediate. In *People v. Carter* (2005) 36 Cal.4th 1114, 1182 [32 Cal.Rptr.3d 759, 117 P.3d 476], we upheld a flight instruction where the defendant left California for Las Vegas days after the crimes. (See *People v. Abilez* (2007) 41 Cal.4th 472, 522 [61 Cal.Rptr.3d 526, 161 P.3d 58].) The jury here could reasonably infer that defendant fled when he concluded that suspicion had focused on him.

Defendant next contends that the flight instruction is an improper pinpoint instruction. We rejected this argument in *People v. Mendoza* (2000) 24 Cal.4th 130 [99 Cal.Rptr.2d 485, 6 P.3d 150]. "The instruction informs the jury that it may consider flight in connection with all other proven facts, giving the fact of flight the weight the jury deems appropriate. [Citation.] The instruction is not argumentative; it does not impermissibly direct the jury to make only one inference. Finally, defendant contends the instruction unconstitutionally lessens the prosecution's burden of proof. It does not. [Citation.]" (*Id.* at pp. 180–181.)

Finally, defendant contends that consciousness of guilt instructions like CALJIC No. 2.52 (and see Judicial Council of Cal. Crim. Jury Instns. (2007–2008) CALCRIM No. 362) invite the jury to draw irrational and impermissible inferences with regard to a defendant's state of mind at the time the offense was committed. We have repeatedly rejected this argument (see, e.g., *Jackson, supra*, 13 Cal.4th at pp. 1222–1224), and do so here.

### 2. *Accomplice Testimony*

Defendant contends the trial court, sua sponte, should have given the jury accomplice testimony instructions with regard to Desron Kimbell.

The general rule is that the testimony of all witnesses is to be judged by the same legal standard. In the case of testimony by one who might be an accomplice, however, the law provides two safeguards. The jury is instructed to view with caution testimony of an accomplice that *tends to incriminate* the

defendant. It is also told that it cannot convict a defendant on the testimony of an accomplice alone. (CALCRIM No. 334.)[12]

The Attorney General argues that Kimbell's testimony did not tend to incriminate defendant. Kimbell's testimony only served to establish his own alibi and was consistent with defendant's final statement that Kimbell had nothing to do with Wendy's death. Defendant responds that whenever the evidence shows that a crime was committed by one of two persons, X or the defendant, testimony that X was not present when the crime was committed tends to incriminate the defendant.

We need not resolve the question whether Kimbell's testimony tended to incriminate defendant. Any error in failing to give a "view with caution" instruction here was clearly harmless. Defendant retracted his statement implicating Kimbell, and the other evidence against defendant was overwhelming.

Any error in failing to instruct the jury that it could not convict defendant on the testimony of an accomplice alone was also clearly harmless. Section 1111[13] "serves to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives." (*People v. Davis* (2005) 36 Cal.4th 510, 547 [31 Cal.Rptr.3d 96, 115 P.3d 417]; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1132 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Belton* (1979) 23 Cal.3d 516, 526 [153 Cal.Rptr. 195, 591 P.2d 485].) One of those "self-serving motives" would be to shift blame to someone else. But that did not happen here. Because Kimbell merely denied involvement in the offenses charged, and did

_____

[12] At the time of defendant's trial the accomplice testimony instructions did not specify that it was accomplice testimony that tended to incriminate a defendant that was to be viewed with caution. The current accomplice testimony instructions were drafted in light of *People v. Guiuan* (1998) 18 Cal.4th 558 [76 Cal.Rptr.2d 239, 957 P.2d 928]. There, the defendant's three accomplices testified for the prosecution, but some of their testimony was possibly favorable to the defense. The trial court, without objection, instructed the jury that an accomplice's testimony should be viewed with distrust. On appeal, the defendant contended that the trial court erred in failing, sua sponte, to modify the then standard jury instruction to say that only those portions of the accomplice testimony that tended to incriminate the defendant were to be viewed with distrust. We held that in the absence of any objection, the trial court was not required, sua sponte, to so modify the instruction. (18 Cal.4th at pp. 569–570.) We went on to hold that "the instruction concerning accomplice testimony should henceforth refer only to testimony that tends to incriminate the defendant." (*Id.* at p. 569.) We also said the term " 'care and caution' " should be substituted for "distrust." (*Ibid.*)

[13] Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

not testify that defendant sexually assaulted or killed Wendy, the jury could not have based a conviction solely on his testimony.

### 3. *Photographic Evidence*

Defendant contends that the admission of a color autopsy photograph depicting hemorrhaging at the entrance of Wendy's vagina was state law error and violative of his rights under the federal Constitution. (U.S. Const., 5th, 6th, 8th, 14th Amends.; Evid. Code, § 352.) The contention lacks merit.

As earlier noted (*ante*, at pp. 1008–1009), the extent of Wendy's vaginal hemorrhaging was disputed. The coroner characterized it as "minor" or "minimal," while another prosecution witness, Dr. Carol Berkowitz, described it as "moderate to severe." Initially, the trial court excluded the challenged 16-by-20-inch print because it determined that an 8-by-10-inch print of the same photograph was sufficiently clear. However, it said it would reconsider the matter if a question arose as to whether the 8-by-10-inch print, which it had admitted without objection, adequately depicted the extent of Wendy's injuries. Later the court did reverse itself, as a consequence of defense counsel's cross-examination of Dr. Berkowitz. Defense counsel asked Dr. Berkowitz whether she was "able to form any opinion as to the size of this apparent injury or trauma." Dr. Berkowitz responded that she would have to refer again to the larger print, which the court had permitted her to consult earlier in the cross-examination. The prosecutor again moved to admit the larger print, noting that the jury should be permitted to see it since Dr. Berkowitz relied upon it. The court granted the motion, noting that defense counsel "brought into issue the size of the trauma . . . and got [Dr. Berkowitz] into the position where she is relying on [the larger photograph]."

The admission of photographs lies within the broad discretion of the trial court under Evidence Code section 352 when a claim is made that they are unduly inflammatory. The court's exercise of its discretion will not be disturbed on appeal unless the probative value of the photographs is clearly outweighed by their prejudicial effect. (See, e.g., *People v. Zambrano* (2007) 41 Cal.4th 1082, 1149 [63 Cal.Rptr.3d 297, 163 P.3d 4] (*Zambrano*).)

The admission of the larger print was not an abuse of the trial court's discretion, nor did it violate defendant's federal constitutional rights. Like all other relevant evidence, photos are generally admissible so long as their probative value is not substantially outweighed by their prejudicial effect. (*Zambrano, supra,* 41 Cal.4th at p. 1150, fn. 23.) We have examined the larger photograph. It is not gruesome. The hemorrhaging of Wendy's vagina was internal and manifested only as a dark reddening of a portion of the outer

rim of her vagina. Autopsy photographs are seldom pleasant, but they are often highly relevant. The admissibility of the smaller print was undisputed, and defense counsel's cross-examination of Dr. Berkowitz revealed the larger print's probative value because it better depicted the extent of Wendy's injuries. There was no error.

Finally, the record does not support defendant's contention the trial court failed to exercise its discretion in admitting the larger photograph because it felt "bound" to do so when Dr. Berkowitz referred to it. Dr. Berkowitz was properly allowed to refer to the photo because of defendant's chosen line of cross-examination. The record demonstrates that the court knew the nature of its discretionary role and properly exercised it as the presentation of evidence evolved.

### 4. *Motive Instruction*

Over defense objection, the court gave the standard instruction that motive was not an element of the offense, but that the jury might consider, and assign whatever weight it found appropriate to the presence or absence of motive as tending to establish guilt or innocence. (CALJIC No. 2.51; see CALCRIM No. 370.)

Defendant contends this instruction was constitutionally defective because it (1) allowed the jury to determine guilt based on motive alone; (2) lessened the People's burden of proof; and (3) shifted the burden of proof to imply that he had to prove his innocence. (U.S. Const., 5th, 6th, 8th, 14th Amends.)

We have repeatedly rejected these arguments (*People v. Cleveland* (2004) 32 Cal.4th 704, 750 [11 Cal.Rptr.3d 236, 86 P.3d 302]) and defendant gives us no reason to reconsider our views.

### 5. *Consciousness of Guilt Instruction*

Defendant gave five statements to the police. In his first three statements, he claimed he had not seen Wendy again after giving her a partial payment for the earrings. In his fourth statement, he admitted having intercourse with Wendy, but claimed Desron Kimbell shot her. In his final statement, defendant completely exonerated Kimbell. He admitted shooting Wendy, but claimed he did so accidentally. (*Ante*, at pp. 1006–1008.)

In light of these discrepancies, the court instructed the jury that it could consider any false statements made by defendant as evidence of his consciousness of guilt. It also instructed that such conduct alone is insufficient to

prove guilt, and that its weight and significance, if any, were matters for the jury to determine. (See CALJIC No. 2.03; CALCRIM No. 362.)

Defendant contends the instruction was impermissibly argumentative and encouraged the jury to irrationally conclude that false statements may manifest a consciousness of guilt, thereby violating his state and federal constitutional rights to due process, a jury trial before a properly instructed jury, and a fair and reliable capital trial. (U.S. Const., 6th, 8th, 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.)

The instruction was properly given here. Contrary to defendant's claim, the jury could quite reasonably conclude that defendant made a series of false statements to deflect suspicion from himself. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1057 [63 Cal.Rptr.3d 82, 162 P.3d 596] (*Barnwell*).) We have repeatedly rejected arguments attacking the instruction (*ibid.*; *People v. Nakahara* (2003) 30 Cal.4th 705, 713 [134 Cal.Rptr.2d 223, 68 P.3d 1190] (*Nakahara*), and cases cited) and do so again.

### 6. *Murder Instructions*

The jury was instructed on both premeditated murder and felony murder. (See CALJIC Nos. 8.20, 8.21; CALCRIM Nos. 520, 540A.) Defendant contends the instructions should have required the jury to agree unanimously, and beyond a reasonable doubt, upon a single theory. This alleged error, defendant argues, denied him due process, a verdict rendered beyond a reasonable doubt, and a reliable guilt determination under the California and federal Constitutions. We have repeatedly rejected this contention for the reasons stated in *Nakahara, supra,* 30 Cal.4th at page 712, and the cases cited therein. Defendant makes no persuasive argument to overturn settled authority on this point.

### 7. *Lesser Included Offenses Instruction*

Defendant contends that CALJIC No. 17.10, the instruction that requires a unanimous acquittal of the greater offense before returning a verdict on a lesser included offense, violated his rights under several provisions of the federal Constitution. (U.S. Const., 5th, 6th, 8th, 14th Amends.) This precise issue has been repeatedly rejected by this court, and defendant makes no persuasive counterargument. (See, e.g., *People v. Cox* (2003) 30 Cal.4th 916, 967 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

### 8. *Reasonable Doubt*

Defendant contends that various standard instructions[14] undermined the requirement of proof beyond a reasonable doubt. We have repeatedly

---

[14] CALJIC Nos. 2.01, 2.02, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, 8.83, and 8.83.1.

rejected these arguments. (See, e.g., *People v. Crew* (2003) 31 Cal.4th 822, 847–848 [3 Cal.Rptr.3d 733, 74 P.3d 820].) Each of these instructions "is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof." (*Nakahara, supra*, 30 Cal.4th at p. 715.) We note again that jurors are told to consider the instructions as a whole. (See CALJIC No. 1.01; CALCRIM No. 200.) Nothing in the instructions undermines this central premise of criminal law.

## C. Penalty Phase Issues

### 1. Evidence of Other Crimes

In the penalty phase, the jury was instructed that before it could consider defendant's prior criminal activities as aggravating circumstances (§ 190.3, factor (b)), it had to be satisfied beyond a reasonable doubt that he was convicted of the crime or committed the criminal acts. (CALJIC Nos. 8.86, 8.87.) The court defined reasonable doubt in the guilt phase, but failed to do so again in the penalty phase. .

■ This error was harmless. "The court should have redefined reasonable doubt at the penalty phase. However, as in *People v. Holt* (1997) 15 Cal.4th 619, 685 [63 Cal.Rptr.2d 782, 937 P.2d 213], '[a]ny possible error arising from the court's failure to [do so] was harmless.' Absent any suggestion to the contrary, the jury would likely have assumed the reasonable doubt the court referred to at the penalty phase had the same meaning as the term had during the guilt phase. There is no reasonable likelihood (*People v. Kelly* (1992) 1 Cal.4th 495, 525 [3 Cal.Rptr.2d 677, 822 P.2d 385]) the jury would have believed the reasonable doubt analysis it was required to engage in at the penalty phase was somehow different than the reasonable doubt analysis it had already engaged in at the guilt phase. That the court would not have changed the meaning of such an important term without saying so is a 'commonsense understanding of the instructions in the light of all that has taken place at the trial [that is] likely to prevail over technical hairsplitting.' (*Boyde v. California* (1990) 494 U.S. 370, 381 [108 L.Ed.2d 316, 110 S.Ct. 1190].)" (*People v. Chatman* (2006) 38 Cal.4th 344, 408 [42 Cal.Rptr.3d 621, 133 P.3d 534] (*Chatman*).)

Defendant contends these penalty phase instructions were also defective because they failed to clarify that it was the People's burden to prove the prior criminal activity beyond a reasonable doubt. This argument also lacks merit. The only reasonable interpretation of the challenged instructions is that the party presenting evidence of defendant's prior criminal activity bore the

burden of proving it beyond a reasonable doubt. Certainly the jury could not have understood that defendant had the burden to prove his own criminal conduct.

Finally, defendant urges us to reconsider our holding in *People v. Holt, supra,* 15 Cal.4th 619, in light of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] (*Ring*). In *Apprendi,* the United States Supreme Court found a constitutional requirement that any fact, other than a prior conviction, which increases the maximum penalty for a crime, must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. (*Apprendi,* at pp. 476–490.) Nothing in *Apprendi* causes us to doubt our conclusion that, "[a]bsent any suggestion to the contrary, the jury would likely have assumed the reasonable doubt the court referred to at the penalty phase had the same meaning as the term had during the guilt phase." (*Chatman, supra,* 38 Cal.4th at p. 408.)

### 2. *Possession of a Deadly Weapon in Jail*

As earlier noted (*ante,* at p. 1012), a "shank" was discovered in defendant's jail cell.[15] During the penalty phase, the jury was instructed that "possession of a deadly weapon in a jail, which involved the . . . threat of force or violence" could be considered as an aggravating factor, if a juror was satisfied beyond a reasonable doubt that defendant committed that criminal act. (See CALJIC No. 8.87.)[16] Defendant contends the instruction was constitutionally defective because it did not define *deadly weapon.* (U.S. Const., 6th, 8th, 14th Amends.) The contention lacks merit. (*People v. Cook* (2006) 39 Cal.4th 566, 611 [47 Cal.Rptr.3d 22, 139 P.3d 492].) "Instructions to the jury on the elements of unadjudicated crimes are not required by logic or by the constitutional guarantees of due process, fundamental fairness, right to a fair trial, equal protection, or reliability of penalty. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 668 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

Defendant also contends the trial court's instruction "improperly directed the jury to presume that possession of a weapon in jail involved . . . the threat of force or violence." He urges that whether the offense involved the threat of

---

[15] Section 4574, subdivision (a), makes it a felony for a county jail inmate to possess a deadly weapon. Within the meaning of this section, an object is a deadly weapon if it has a reasonable potential of inflicting great bodily injury or death. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1178 [13 Cal.Rptr.3d 34, 89 P.3d 353], and cases cited.)

[16] Section 190.3, factor (b), permits a jury to consider as an aggravating circumstance "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

force or violence was a question for the jury to decide. To the contrary, it was a legal issue to be decided by the court, as we have repeatedly held. (See, e.g., *People v. Gray* (2005) 37 Cal.4th 168, 235 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

Finally, we reject defendant's contention that possession of a deadly weapon by a jail inmate (§ 4574) is "an unconstitutionally overbroad aggravating factor" in the circumstances of this case. Defendant notes that "a chain necklace with a religious medal could be used as a garrote . . . ." That may be true. However, the fact that the weapon here was a long metal screw filed to a point and affixed with a handle to facilitate its use for stabbing is sufficient to distinguish defendant's hypothetical.

### 3. *Alleged Coercion of Deadlocked Jury*

After more than two weeks of penalty deliberations, when only one alternate juror remained available, two of the deliberating jurors, M.H. and the foreperson, R.T., asked to be discharged because of family vacation plans. The court discharged M.H., but retained R.T. The jury reached its verdict after deliberating for two more days. Defendant contends that under the circumstances the verdict was coerced, violating his right to due process under the California and federal Constitutions and rendering the verdict unreliable under the Eighth Amendment to the United States Constitution. The contention fails.

The jury began its deliberations on Monday, July 27, 1992, with five alternate jurors available. Two days later, the jury was given the balance of the week off because of the medical needs of one juror and the speaking engagement of another. On Tuesday, August 4, Juror I.D. was excused because of a death in the family and Alternate Juror C.W. was discharged because of vacation plans. On Friday, August 7, Juror J.G. was discharged because of vacation plans. On Tuesday, August 11, Juror H.B. was discharged because the prolonged deliberations were exacerbating his posttraumatic stress disorder. When each of the three alternate jurors was seated, the jury was instructed to begin their deliberations anew.

On Friday, August 14, Juror M.H. and Foreperson R.T. both asked to be discharged because of prepaid family vacations. Juror M.H. had already forfeited a nonrefundable airline ticket to accompany her daughter and grandchild on a vacation. She wished to be discharged so she could take a bus and join them. Foreperson R.T. had already forfeited prepaid campground reservations for a two-week family vacation in Sequoia National Park because the court had declined to discharge him. He was about to forfeit a prepaid campground reservation for another week of vacation with them in Yosemite National Park.

The court faced a dilemma because only one alternate remained. If both M.H. and R.T. were excused, a mistrial would ensue. The court asked whether there was "any likelihood" a verdict could be reached if deliberations continued. Ten of the 12 jurors believed there was.

The court then asked the jury to confer and respond to two more questions: (1) What was the numerical breakdown of its nine ballots?[17] (2) In light of the fact that only one alternate remained, would one of the two jurors seeking discharge be willing to remain?

The note sent in response to these questions requested that of the two jurors seeking discharge, M.H. be the one released. It also informed the court that the original jury had split three to nine, two to 10, three to nine, and two to 10. The substitution of the first alternate produced a vote of two to 10. The vote remained two to 10 after the second alternate was seated. With the third alternate, the vote was one to 11, two to 10, and one to 11.

The jurors returned to the courtroom and the court asked whether the note indicated that Foreperson R.T. was "willing to stay for an additional day, until Monday or so. Is that what this indicates?" R.T. responded, "I don't think it was a question of willing to stay, Your Honor." He continued, "I would be willing to go. But you asked us to make a decision between two jurors that had requested vacation, and we made that decision as you asked."

The court denied defendant's motion for a mistrial on the ground that the circumstances had become coercive.[18] The court seated the last alternate and instructed the jury to begin its deliberations anew again on the following Monday morning. The court concluded by saying that both counsel had asked him to say "that you guys are doing a job above and beyond; and this court agrees."

On Monday, August 17, the testimony of Dr. James Bush, the defense penalty phase expert, was read to the jury at its request. At 4:00 p.m. on Tuesday, August 18, the jury reached its verdict.

 A trial court may ask jurors to continue deliberating when, in the exercise of its discretion, it finds a "reasonable probability" they will be able to reach agreement. (§ 1140;[19] *People v. Pride* (1992) 3 Cal.4th 195, 265 [10

---

[17] The court cautioned that it was not asking whether the majorities were "for or against" death.

[18] The grounds stated were: "The fact that there has not been any significant change in the balloting, that the jurors have been deliberating at length, that they have sacrificed personal vacations and they are continuing to be put in a position that that is what they are doing."

[19] Section 1140 provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration

Cal.Rptr.2d 636, 833 P.2d 643], and cases cited.) We find no abuse of discretion here. The record amply supports the trial court's decision. Ten of the 12 jurors responded positively to the court's question whether there was any likelihood of reaching agreement.[20]

Defendant contends Foreperson R.T. was coerced into continuing to deliberate. While the court asked whether one of the two jurors seeking to be discharged would be "willing to stay," defendant argues that R.T.'s response "can only be interpreted" as saying: "I want to go on vacation but you said that only one of us could leave. I got the short end of the stick." It is clear R.T. would have preferred to be excused. Nevertheless, we find no abuse of discretion in denying R.T.'s request. There was no evidence that he would be unable to perform his duties if he stayed. To the contrary, he was clearly prepared to continue doing his duty as a juror, even though it continued to entail personal sacrifice.

Defendant asks us, in effect, to conclude as a matter of law that the holdout juror was coerced into returning a verdict of death because Foreperson R.T. was going to lose another week's campground fee. This we will not do. (See *People v. Beeler* (1995) 9 Cal.4th 953, 990 [39 Cal.Rptr.2d 607, 891 P.2d 153] (*Beeler*).)[21] Jury service is a demanding but important part of civic responsibility. It almost always involves a level of sacrifice. But simply because the undertaking is difficult, or because many people would rather avoid it, does not make the conscientious discharge of this duty coerced. Moreover, the facts belie defendant's position. The week at the campground for which Foreperson R.T. had prepaid began on August 16, 1992. Nevertheless, the jury deliberated all day on the 17th and 18th before reaching its verdict.

Finally, defendant contends that the court coerced the jurors by simply inquiring into the numerical divisions of their votes, even though it was careful not to ask whether the votes had favored life or death. We have repeatedly rejected this contention. (*People v. Proctor* (1992) 4 Cal.4th 499, 538 [15 Cal.Rptr.2d 340, 842 P.2d 1100]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 776 [230 Cal.Rptr. 667, 726 P.2d 113]; *People v. Carter* (1968) 68 Cal.2d 810, 815 [69 Cal.Rptr. 297, 442 P.2d 353].) We have done so in recognition of the fact that the federal procedural rule is otherwise. (*Proctor*, at p. 539.) We find the federal rule, which is not binding on us, unpersuasive

---

of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

[20] Foreperson R.T. was one of the 10 holding that belief.

[21] In *Beeler, supra,* 9 Cal.4th 953, this court declined to assume as a matter of law that the death of a parent would be so debilitating that a juror would be presumptively unable to deliberate. (*Id.* at p. 990.)

because this information obviously bears on the question the court is obliged to address: whether there is a reasonable probability the jury will be able to reach a verdict if it continues to deliberate.

### 4. *Constitutionality of Death Penalty Statute*

Defendant mounts a number of challenges to California's death penalty statute. We recently rejected the very same set of arguments in *Barnwell, supra,* 41 Cal.4th at pages 1058–1059.

The death penalty law adequately narrows the class of death-eligible offenders. (See, e.g., *People v. Dickey* (2005) 35 Cal.4th 884, 931 [28 Cal.Rptr.3d 647, 111 P.3d 921] (*Dickey*).)

Consideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty. (See, e.g., *People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244] (*Brown*).)

The death penalty is not unconstitutional for failing to impose a specific burden of proof as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence. (See, e.g., *Brown, supra,* 33 Cal.4th 382, 401.) Nor do the high court's decisions in *Apprendi, supra,* 530 U.S. 466, *Ring, supra,* 536 U.S. 584, or *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], alter this conclusion, either with respect to the existence of an aggravating factor or as to the determination whether aggravating factors outweigh mitigating factors. (See, e.g., *People v. Cornwell* (2005) 37 Cal.4th 50, 104 [33 Cal.Rptr.3d 1, 117 P.3d 622].)

The jury need not make written findings, or achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes). (See, e.g., *People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

Intercase proportionality review is not constitutionally required. (*Dickey, supra,* 35 Cal.4th at p. 931.)

A penalty phase jury may consider prior unadjudicated criminal conduct under section 190.3, factor (b), and the jury need not make a unanimous finding that the defendant was guilty of the unadjudicated crimes. (See, e.g., *People v. Elliot* (2005) 37 Cal.4th 453, 488 [35 Cal.Rptr.3d 759, 122 P.3d 968] (*Elliot*).)

Section 190.3's use of adjectives such as "extreme" (*id.,* factors (d), (g)) and "substantial" (*id.,* factor (g)) in describing mitigating circumstances does not impermissibly limit consideration of such factors. (See, e.g., *Elliot, supra,* 37 Cal.4th at p. 488.)

A penalty phase jury need not be instructed that section 190.3, factors (d), (e), (f), (g), (h), and (j) can only mitigate, and not aggravate, the crime. (See, e.g., *Elliot, supra,* 37 Cal.4th at p. 488.)

The death penalty law does not deny capital defendants equal protection because it provides a different method of determining the sentence than is used in noncapital cases. (See, e.g., *People v. Smith* (2005) 35 Cal.4th 334, 374 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties. (See, e.g., *Elliot, supra,* 37 Cal.4th at p. 488.)

### 5. *Intracase Disproportionality Review*

Upon request, we review the facts of a case to determine whether a death sentence is so disproportionate to a defendant's culpability as to violate the California Constitution's prohibition against cruel or unusual punishment. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1426–1427 [58 Cal.Rptr.3d 368, 157 P.3d 973], and cases cited.) Defendant's death sentence does not shock the conscience or offend fundamental notions of dignity. (See, e.g., *People v. Ramos* (1997) 15 Cal.4th 1133, 1182 [64 Cal.Rptr.2d 892, 938 P.2d 950].) He raped an 11-year-old child, bound her, and shot her to death at pointblank range. He then hid her body, which went undetected for almost two days. He lied repeatedly to avoid responsibility. In addition, he committed other crimes of violence both before and after murdering Wendy.

### 6. *Alleged Cumulative Error*

Finally, there was no cumulative prejudice.

### III. DISPOSITION

We affirm the judgment.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I join the majority in affirming the judgment. I disagree, however, with the majority's analysis of defendant's

claim that the prosecution's challenges to three prospective jurors were made on the impermissible basis of their race or ethnicity.

During jury selection, defendant objected to the prosecution's peremptory challenges to three prospective jurors. Two of those jurors, P.T. and D.M., were African-American (as is defendant), and defense counsel asserted that the prosecution had challenged them because of their race. The third prospective juror, A.A., was Hispanic, and defense counsel contended that he was challenged because he was a "person of color." In each instance, the trial court concluded that the defense had not made a prima facie showing that the prosecution's peremptory challenges were made for a discriminatory purpose, but it invited the prosecution to give reasons for the three challenges. The prosecution did so, and in each instance the trial court evaluated these reasons and then overruled the defense objection. On this appeal, defendant faults those rulings, contending that the prosecution's peremptory challenges violated his right under the California Constitution to a jury drawn from a representative cross-section of the community (see *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*)), as well as his right to equal protection under the Fourteenth Amendment to the federal Constitution (see *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*)).[1]

As the United States Supreme Court has explained, a three-step procedure applies when, as here, a party argues in the trial court that the opposing party is exercising a peremptory challenge for constitutionally impermissible reasons. First, the party attacking the peremptory challenge "must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410].) Once that showing is made, the burden shifts to the party who exercised the challenge to give its reasons. Then the trial court must decide whether the challenge was based on constitutionally permissible grounds. (*Ibid.*; see also *People v. Johnson* (2006) 38 Cal.4th 1096, 1099 [45 Cal.Rptr.3d 1, 136 P.3d 804].)

Applying here the first of that three-part test, the majority concludes that defendant failed to make a prima facie showing that any of the prosecution's challenges were based on group bias. The majority reaches that conclusion after an independent review of the juror questionnaires and the prospective jurors' answers to questions asked on voir dire. Because defendant did not

---

[1] At trial, defendant cited only to this court's decision in *Wheeler, supra,* 22 Cal.3d 258, which is based on the *state* Constitution. On appeal, however, this court may properly consider his *federal* constitutional claim as well, because it is substantially similar to his claim under the state Constitution. (*People v. Panah* (2005) 35 Cal.4th 395, 438, fn. 13 [25 Cal.Rptr.3d 672, 107 P.3d 790].)

make the requisite prima facie showing, the majority holds, the trial court properly denied his *Wheeler* motion. (Maj. opn., *ante*, at pp. 1018–1020.)

I question the majority's mode of analysis. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (*Hernandez v. New York* (1991) 500 U.S. 352, 359 [114 L.Ed.2d 395, 111 S.Ct. 1859] (plur. opn. of Kennedy, J.); see also *People v. Boyette* (2002) 29 Cal.4th 381, 469 [127 Cal.Rptr.2d 544, 58 P.3d 391] (dis. opn. of Kennard, J.).) Here, the prosecution gave reasons for the three peremptory challenges, and the trial court found no showing of intentional group discrimination. Thus, the preliminary issue of whether the defense made the requisite prima facie showing became moot. What does need to be decided, however, is whether the trial court was right in ruling that the prosecution's three peremptory challenges were not impermissibly motivated by group bias. That determination requires an examination of the prosecution's reasons for those peremptory challenges, a process in which the majority has not engaged.

The following illustration shows the inadequacy of the majority's approach: A defendant objects at trial to the prosecution's peremptory challenge to a prospective juror, asserting it is motivated by group bias. The trial court correctly concludes that the defense has not made the requisite prima facie showing but, out of an abundance of caution, asks the prosecution to state the reasons for the challenge. The prosecution responds that the challenge was made because of the prospective juror's religious affiliation, unaware, as is the trial court, that this is a constitutionally impermissible reason. (See *People v. Bell* (2007) 40 Cal.4th 582, 596 [54 Cal.Rptr.3d 453, 151 P.3d 292].) The trial court overrules the defendant's objection. Because in this example the defense had not made a prima facie showing of impermissible group bias before the prosecution gave its religion-based reason, the majority's approach, when applied to this example, would ignore the fact that the prosecution's stated reason for the peremptory challenge was religion-based, in violation of the defendant's right under the California Constitution to a jury drawn from a fair cross-section of the population. This is wrong. When the prosecution's stated reasons for a peremptory challenge are improper, " 'courts cannot effectively close their eyes to that fact by simply deciding that the defendant has not made out a prima facie case.' " (*Holloway v. Horn* (3d Cir. 2004) 355 F.3d 707, 724.) Thus, to evaluate defendant's claim here of *Wheeler/Batson* error, there needs to be an examination of the prosecution's reasons for peremptorily challenging the three prospective jurors. Only then can it be determined whether the challenges were based on constitutionally permissible or impermissible grounds.

The prosecution said that its challenge to Prospective Juror P.T. was based on the juror's attitude. In responding to the juror questionnaire, the juror said that if she disagreed with the judge's instructions she would discuss the matter with the judge and they would "have to come to some agreement." The prosecution considered that response "arrogant" and described the juror's answers to voir dire questions as "flip" and the juror's attitude in court as "smarty." The trial court agreed.

The prosecution said it peremptorily challenged Prospective Juror D.M., a former professional football player, because "[t]here was a swagger to his walk and a bravado in his style" that caused the prosecution to be concerned "about his ability to reach a consensus or to consider the matter carefully." Defense counsel responded that D.M. "moved like an athlete," a fact that counsel said had no bearing on his attitude toward the case. The trial court agreed with the prosecution's concern, noting that the juror had refused to answer most of the inquiries on the jury questionnaire, writing the word "confidential" instead of an answer.

The prosecution challenged Prospective Juror A.A. because he had displayed in court a "flip attitude" by "swinging in his seat" during voir dire and "smirking at" the prosecutor, because he felt that child molesters who kill should "get treatment," and because he strongly disagreed with the view that "an eye for an eye would be a fair and proper rule in the administration of the criminal justice system." The trial court agreed, describing the juror as "immature, moving in his chair, flippant in his answers on his questionnaire . . . [and] trying to get off the jury panel."

Substantial evidence supports the trial court's ruling that the prosecution's reasons for the peremptory challenges to the three prospective jurors in question were genuine and were neutral as to race and ethnicity. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 196 [58 Cal.Rptr.2d 385, 926 P.2d 365] ["An appellate court reviews a trial court's ruling on a motion under *Wheeler* and/or *Batson* for substantial evidence."].) Because the trial court observed the demeanor of these prospective jurors, its findings are entitled to great deference. (*People v. Reynoso* (2003) 31 Cal.4th 903, 926 [3 Cal.Rptr.3d 769, 74 P.3d 852].)

Defendant insists that the prosecution's reasons were pretextual, stating that the three challenged jurors' answers to the jury questionnaires and their responses on voir dire did not differ significantly from those given by other prospective jurors. Assuming for the sake of argument that, when a defendant raises this issue for the first time on appeal, this court must undertake a comparative juror analysis (see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1109 [63 Cal.Rptr.3d 297, 163 P.3d 4]), defendant's argument here is

unpersuasive. There is no evidence that the other prospective jurors displayed the sort of demeanor that caused the prosecution to be concerned that the three challenged jurors might not fairly consider the evidence presented by the prosecution.

To summarize, the majority is wrong in rejecting defendant's claim of *Wheeler* error based on his failure to make a prima facie showing that the prosecution's peremptory challenges were motivated by a discriminatory purpose. Instead, the majority should have examined the prosecution's stated reasons for the challenges. Nevertheless, as explained above, I agree with the majority's conclusion that the trial court properly rejected defendant's *Wheeler* claim.

Moreno, J., concurred.

Appellant's petition for a rehearing was denied March 26, 2008.