Filed 6/26/13  P. v. Son CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G045798 |
| v. | (Super. Ct. No. 08WF2001) |
| JOSEPH SON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseño, Judge.  Affirmed.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

In October 2008, the Orange County District Attorney filed a felony complaint against defendant Joseph Son charging him with 17 sex offenses alleged to have been committed against one female victim on Christmas Eve 1990. The complaint further alleged defendant kidnapped the victim to commit the sexual assaults (Pen. Code, § 667.8, subd. (a); all statutory references are to the Penal Code unless otherwise stated), personally used a firearm during each of the offenses (§§ 12022.5, subd. (a); 12022.3, subd. (a)), and inflicted great bodily injury on the victim (§ 12022.8).

Apparently recognizing the sex offenses were barred by the applicable statute of limitations (see § 801.1), the district attorney filed an amended complaint in April 2010, omitting all the previously charged offenses and inserting one count each of conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a); count one) and torture (§ 206; count two).[1] The subsequent information alleged the same two charges.

A jury found defendant guilty of torture and acquitted him of conspiracy to murder the victim. The court sentenced defendant to life in prison with the possibility of parole. Defendant appeals, contending the trial court (1) committed prejudicial error and denied him due process and the right to confront and cross-examine witnesses in excluding certain defense evidence, (2) precluded defense counsel from making an opening statement prior to the close of the prosecution's case-in-chief, in violation of his constitutional right to counsel, (3) failed to instruct the jury that assault with force likely to cause great bodily injury is a lesser included offense of torture, and (4) erred in instructing the jury that motive is not an element of torture. We affirm. We find the trial court erred in ruling defense counsel could not make an opening statement until the close of the prosecution's case-in-chief, but conclude the error was harmless and not of constitutional dimension.

---

[1] Conspiracy to commit murder and torture each carry life sentences (§§ 182, 190, subd. (a), 206.1) and as a result, there is no applicable statute of limitations to either charge. (§ 799.)

I

FACTS

On December 24, 1990, B. was 19 years old and lived in a large, gated apartment complex in Huntington Beach. That night she returned home late after looking at Christmas lights. She parked in the carport, put her small dog inside her jacket because the weather was cold, and walked toward her apartment. As she walked, she heard a sound, looked over her shoulder and saw a man quickly approaching. He said he was lost and asked for directions to the beach. Another man immediately approached and said they were lost. The two men got closer to B., with one in front of her and the other behind her. She identified defendant as the male who stood behind her.

Defendant reached around B. and jabbed his fingers into her eyes. The bottom of his hand pushed her lips against her teeth, causing her mouth to bleed. He pushed a gun "very hard" into her head and told her, "Bitch, you are going to die." B. struggled, her dog bit the arm of one of the men, and she hit one with her keys and "took off" running. The two men caught her. One of the men grabbed her by the hair, and slammed her to the ground. The back of her head hit the sidewalk and while on her stomach, her head was slammed on the sidewalk "over and over" and she got kneed in the face. She kept moving her head, trying to keep her nose from being broken. A gun was shoved into her mouth, she was pistol whipped several times about the head, and was eventually knocked unconscious.

When she regained consciousness, she felt a hanging sensation. Defendant had her by her arms and the other man had her by her feet. She struggled and defendant dropped her. Her head and shoulders hit the ground. The men carried her to an automobile and put her into the backseat. Defendant drove and told the other male to keep B.'s head down. As he drove away, defendant again told B. she was going to die.

3

The automobile stopped after about 10 to 15 minutes. Defendant got into the backseat and the other man moved to the front. Defendant again told B. she was going to die. He ordered her to take off her clothing, which she did at gunpoint. Defendant told her to orally copulate him, pressed the gun against her neck, and told her the gun was loaded so she should not get any crazy ideas. He said he would blow her brains out if she bit him.

After she orally copulated defendant for about 10 minutes, he pulled her hair, wrapped her jacket around her face, pushed her back onto the backseat of the car, and again said he was going to kill her. Then he raped her. While she was being raped, she complained that she could not breathe because the jacket was over her face. Defendant told her to shut up and stop complaining. At one point during the half hour he was raping her, defendant told B. he wanted her to moan to satisfy him. Defendant ejaculated and had her orally copulate him again.

He also sodomized B. She said it was extremely painful. Defendant said he wondered what it would be like to blow her brains out. He put the barrel of the gun in her vagina and told the other man to take his turn. B. was forced to orally copulate the other male. The other male raped her too, and then the men switched places again. Defendant made additional threats, including telling B. she would not live through the night.

When defendant bit one of her breasts, B. slapped him and told him not to bite. Defendant said he was going to brand her, and scratched her stomach with his fingernails. He raped her again, and again forced her to orally copulate him with a gun to her head as he made more threats.

At one point B. begged for her life, telling defendant she had a small child and had only been out to buy formula for the baby. Defendant told her he was going to take her to Compton and share her with his friends. The men traded places again. The other male raped her a total of three times and made her orally copulate him twice.

4

When they had apparently finished with B., she heard the car start. It moved for a "couple of seconds" before abruptly stopping. The back door opened quickly and B.'s jacket was ripped from her head. Defendant grabbed B. by the hair and yanked her out of the car. She landed "on all fours," naked, and with defendant holding the gun to the top of her head. He again told her she was going to die. She begged for her life and defendant told her something to the effect that this was her lucky day. He told her it was not over and he would come back for her. He then told her to run when he counted to three. The other man put B.'s jacket on her and she ran for her life.

She ran to a nearby house. The police were called and they took her to a hospital. Within hours of the attack, a friend, Mary Hildebrandt, visited B. Hildebrandt said B. looked as if "she had been terribly beaten." B.'s "face looked all swollen," she could not focus well, she appeared to be missing a clump of hair, and she had a knot on her head. According to Hildebrandt, a few days later the bruising was more apparent. She said B.'s face and head were black and blue and B.'s jaw did not look normal, as if it was dislocated or out of joint.

Dr. Gale Kloeffler, a maxillofacial prosthodontist with a practice that focuses on dysfunctional movements of the jaw, treated B. following a referral after her rape. He said B.'s jaw position had been distorted.

Shortly after B. was discharged from the hospital, Hildebrandt took her to doctor appointments for MRI's or CAT scans. Hildebrandt helped B. with doctor appointments for over a year. She probably took B. to four doctor visits a month. Hildebrandt noticed that after the attack, B. could not see clearly or focus during a conversation. B. had to read Hildebrandt's lips because she could not hear. B. also had "a lot of problems with her spine," difficultly walking, and difficulty sitting or standing for long periods of time, a problem B. did not have before the attack. Hildebrandt would take B.'s arm when walking to a doctor's office because B.'s "balance was off." Reading was more difficult for her. Hildebrandt said B. "used to like to draw a lot and do

5

sketching and stuff, and when she would try to print or write something, it's like the letters either went backwards or—it's like the brain didn't like work with her hands, and she was good at printing and things before, and now she was having difficulty doing that." B. also had numbness in her hands.

B. said that as a result of the attack she had blurry vision, saw double, and would occasionally see what she described as prism lines. Her eyelids were torn and her eyes scratched. She had pain deep inside her eye sockets, which she described as "horrendous." The pain lasted for years. She had to wear glasses or contacts as a result of the attack.

B.'s ophthalmologist, Dr. Robert Everakes saw B. on an emergency basis on December 27, 1990. He eventually prescribed soft contact lenses.

She also suffered an injury to the rotator cuff of her left shoulder, requiring surgery because her shoulder would "dislocate constantly," and she had burning and numbness in her hands. Detective Howell had a number of contacts with B. in the six or seven months following the attack to check up on her medical condition. He remembers B. telling him in July 1991, she was having problems with her left shoulder. She said it kept dislocating. She also said she had numbness in her hands from her spinal column injury, 80 percent hearing loss in her right ear and 50 percent hearing loss in her left ear. She also complained of passing out from time to time due to three tears in her brain suffered during the attack.

B. said all her teeth were loosened by the attack and her jaw constantly pops, and locks on occasion. After the attack she had to wear a mouth brace. She also had a lot of pain from her fractured ribs and mobility issues with her back and neck. She was under a chiropractor's care for a year after the attack. Her neck was constantly sore. Additionally, there were injuries to her vaginal and pelvic regions, making it hard for her to sit down and painful to use the restroom. She had to use laxatives because of the pain.

These injuries lasted several months.  She said she could not use tampons for a year due to pain.

B. said she has posttraumatic stress disorder and loss of hearing in both ears due to head injuries sustained in the attack.  She said one side of her face started to "droop" and the eye started to sag.

Detective Howell contacted defendant on September 10, 2008, and took a DNA sample from him by swabbing the inside of defendant's mouth.  A forensic scientist with the Orange County crime lab compared the DNA results from the sperm found in B.'s vagina with the DNA obtained from defendant.  The profiles were the same.  According to the forensic scientist, the profile is more rare than one in one trillion unrelated individuals.

II

DISCUSSION

Defendant contends the trial court prejudicially erred in excluding crucial defense evidence, denied him effective assistance of counsel when it prohibited counsel from making an opening statement prior to the close of the prosecution's case, prejudicially erred in failing to instruct the jury on assault with force likely to cause great bodily injury as a lesser included offense of torture and in instructing the jury that motive is not an element of torture.  We address these arguments seriatim.

A.  *Exclusion of Defense Evidence*

Defendant contends the trial court erred in excluding what he characterizes as crucial, relevant defense evidence in violation of the California Constitution  (Cal. Const., art. I, § 28, subd. (d)) and the Evidence Code (Evid. Code, §§ 350, 351).  A trial court may only admit relevant evidence.  (Evid. Code, § 350; *People v. Tully* (2012) 54 Cal.4th 952, 1010.)  "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having a tendency in reason to prove or

7

disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The trial court is vested with wide discretion in determining the admissibility of evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 637.) We review the trial court's evidentiary rulings, including those "that turn on the relative probativeness and prejudice of the evidence in question" for an abuse of discretion. (*People v. Hamilton* (2009) 45 Cal.4th 863, 930.)

Defendant also alleges the exclusion violated due process and his Sixth Amendment right to present a defense and cross-examine witnesses against him. In *Chambers v. Mississippi* (1973) 410 U.S. 284, the Supreme Court reversed the defendant's conviction, finding he had been denied a fair trial because the trial court denied him cross-examination of a witness and excluded certain proffered defense hearsay evidence that "bore persuasive assurances of trustworthiness" and was critical to his defense. (*Id*. at p. 302.)

According to defendant, B. had two reasons to exaggerate her injuries. First, B. sued her apartment complex for negligence based on the attack and injuries she suffered. Second, defendant argued B. had been informed the statute of limitations barred prosecution of the sex offenses and knew she would have to have sustained great bodily injury in order to successfully prosecute defendant. The court rejected defendant's request to question B. about "the injuries being a basis or consideration for the financial settlement she received." The court also prohibited defense counsel from questioning B. about her knowledge of the fact that the applicable statute of limitations barred prosecution for the sex offenses.

1. *Evidence About B.'s Civil Suit*

Prior to ruling on defendant's request to introduce evidence concerning B.'s civil suit, the court obtained briefing from the parties. The briefing did not, however, address one of the issues with which the court stated concern—whether defendant should

be permitted to introduce evidence of the "financial interest in the outcome" of B.'s civil suit.

In a hearing outside the presence of the jury, the court heard evidence that B. brought a lawsuit against the apartment complex where she resided at the time of the attack. She did not know when the lawsuit was initiated. The basis of the lawsuit was a lack of security at the apartment complex with regard to an entry gate which was not locked. B. testified she received a settlement of more than $10,000. The court ruled the defense could introduce evidence that B. filed a lawsuit for damages and that the case settled. The court exercised its discretion and informed defense counsel he would not be permitted to "get into any of the [other] details of the lawsuit." (*People v. Hart* (1999) 20 Cal.4th 546, 606.)

Defendant did not offer any evidence as to what B. claimed in her civil complaint or asserted in discovery. Because the evidence offered was speculative, the trial court did not err in excluding further evidence concerning the lawsuit.

Neither did the ruling deny defendant a fair trial or the right to present a defense. In *Chambers v. Mississippi*, *supra*, 410 U.S. 284, the defendant stood trial for murder of a police officer. The trial court excluded from evidence the confession of Gable McDonald that he was the person who shot and killed the officer (*id*. at pp. 288, 290), evidence the Supreme Court found to be trustworthy. (*Id*. at p. 302.) Here, on the other hand, the evidence defendant sought to introduce was, as we have said, speculative.

2. *Evidence Concerning B.'s Knowledge of the Elements of Torture*

In a hearing outside the presence of the jury, defense counsel informed the court that years after the attack, B. was informed by law enforcement that there was a statute of limitations problem with the case and at some point thereafter, B. learned there was a DNA hit, and she was then questioned a number of times about her injuries. Defense counsel argued "it was relevant that [B.'s] aware of what [defendant is] being charged with, what the elements are, what has to be shown or established in order to

9

prove [the charged offenses] beyond a reasonable doubt." The court noted the awareness of the charges and elements is not an area into which the court typically allows inquiry.

The court did not err in precluding questioning of B. in this area. Although there was an indication B. knew there was a statute of limitations problem with prosecuting the sex offenses, defendant did not make an offer of proof to the effect that B. knew the elements of conspiracy to commit murder or torture. Indeed, the only indication in the record before the court was that B. had not been informed of the elements of the charged offenses. Specifically, B. was *not* informed "the continued prosecution of her case was contingent upon a potential showing that she suffered great bodily injury." Any inquiry into whether B. knew either why defendant was charged with the offenses for which he was on trial or the elements of those offenses, was nothing more than a fishing exhibition. In other words, the speculative evidence was not critical to the jury's assessment of B.'s credibility. Defense counsel cross-examined B. about purported inconsistencies in her descriptions of her injuries and was permitted to introduce the testimony of a police officer concerning the alleged inconsistencies.

Accordingly, we find the trial court did not err in prohibiting defendant from cross-examining B. on *whether* she knew the elements of the charged offense and that torture required proof of great bodily injury. Defendant was not denied a fair trial, the right to cross-examine B., or the right to present evidence.

B. *Prohibiting the Defense from Making an Opening Statement Before the Close of the Prosecution's Case*

Once the jury was selected, the court discussed the procedure to be used at trial. Defense counsel stated his intent to make an opening statement. The court, however, prohibited defense counsel from making his opening until after the prosecution presented its case-in-chief.

10

Defendant contends the trial court denied him his Sixth Amendment right to effective assistance of counsel by prohibiting his attorney from making an opening statement until after the prosecution introduced its case-in-chief. A criminal defendant's right to the effective assistance of counsel is guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and by article I, section 15 of the California Constitution. The "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. [Citations.]" (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) We agree the court erred under California law, but find no constitutional error or prejudice.

Section 1093 prescribes the order of proceedings to be followed in a criminal trial and gives the defense the right to make an opening statement before the introduction of any evidence. "Whether or not the district attorney, or other counsel for the people, makes an opening statement, the defendant or his or her counsel may then make an opening statement, or may reserve the making of an opening statement until after introduction of the evidence in support of the charge." (§ 1093, subd. (b).) Section 1094 creates a limited exception to the procedure set forth in section 1093. "When the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the court, the order prescribed in Section 1093 may be departed from." (§ 1094.)

Prior to reading the information to the jury, and immediately after asking the prosecutor if he had his first witness ready, the court informed the parties how the trial would proceed: "As soon as the jury buzzes the court that they have finished reading Penal Code section 1122 and CALJIC [No.] .50, we are going to bring them out, start with the reading of the information, do your opening statement, then call your first witness. That's how we plan to proceed." Defense counsel stated he had witnesses subpoenaed and it appeared he was going to ask about making his opening statement

11

when the court interrupted him and stated, "I'm going to defer your opening statement to the time that you start your . . . portion of the trial."

It is not uncommon for the court to inform prospective jurors of the witnesses on each side to determine whether any juror knows any of the witnesses. It appears that during jury selection the court inquired of the defense if it had any witnesses to identify to the jury and the defense responded it did not, but that the defense later indicated it had possible impeachment witnesses under subpoena. In ruling the defense could not make an opening statement until the conclusion of the prosecution's case-in-chief, the court stated it was unknown whether B. would make any statements that would be considered inconsistent to any prior statements she made and that the foundation for introducing prior statements was then "completely unknown." After defense counsel asked whether the court would reconsider its ruling, the court indicated it would not and stated it was concerned with whether the purported impeachment witnesses "will or will not be called."

Section 1093 does not limit the right to make an opening statement to those defendants who unconditionally have determined to call witnesses to the stand. A defendant who intends to rely on the state of the evidence for an acquittal also has the right to make an opening statement. "Defendants are entitled to rely on the failure of the evidence of the prosecution and therefore defense counsel may, as an opening statement, content himself with pointing out what facts the Government witnesses will not be able to testify to." (*United States v. Stanfield* (9th Cir. 1975) 521 F.2d 1122, 1125.) While opening statements generally are made to inform the jury what evidence will be presented (*People v. Millwee* (1998) 18 Cal.4th 96, 137 [purpose of opening statement is to inform the jury of the evidence to be presented]), "'[t]he function of an opening statement is not only to inform the jury of the expected evidence, but also to prepare the jurors to follow the evidence and more readily discern its materiality, force, and meaning.' [Citation.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 610.)

12

The court's concern that defendant's impeachment witness(es) might never testify if B. did not testify inconsistently with statements she gave to police shortly after the attack, could have been adequately addressed by instructing defense counsel not to inform the jury such witnesses would be called by the defense. We certainly understand a trial judge's frustration when at first defense counsel informs the court he does not intend to call any witnesses, does not know whether his client will testify, and then says he has two possible witnesses, but those witnesses can testify depending on whether the complaining witness testifies inconsistently. The court could have instructed defense counsel not to discuss the two possible impeachment witnesses, given the fact that at the time defense counsel would make his opening statement it would be unknown whether those witnesses would testify. However, prohibiting defense counsel from informing the jury what he expects the prosecution evidence to show, what he expects the evidence will not show, and to prepare the jury for the nature of the graphic evidence to be introduced went beyond what sound and considered discretion required. Considered discretion did not require the court to remove defense counsel's *only* opportunity to blunt the impact of B.'s testimony. It is too late for defense counsel to remind the jury to keep an open mind during the presentation of the evidence once the evidence has already been admitted. We therefore conclude the trial court erred in denying defendant the right to make an opening statement prior to the presentation of the prosecution's case-in-chief.

However, the error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The court admonished the jury prior to the taking of any evidence pursuant to CALJIC No. .50 to keep an open mind during the course of the trial and not to decide any issue before the matter is submitted for its decision. Moreover, the evidence of defendant's involvement was overwhelming. The only issue contested by defendant in connection with the charge of torture was the extent of B.'s injuries; he did not contest his participation or whether his actions were sadistic. The evidence of great bodily injury was very strong. The evidence of great bodily injury was strong even without B.'s

13

testimony. The resident at the house to which B. fled after the attack said B. had a "big old wound on her head." Hildebrandt saw B. the morning after the attack and said B. looked "like she had been terribly beaten" and B.'s face was "all swollen." A few days later, in the hospital, B.'s face and head were black and blue and her jaw looked as if it was dislocated or out of joint. This was consistent with the testimony of the Dr. Kloeffler who testified B.'s jaw position had been distorted.

Hildebrandt further testified that as a result of the attack, B. had to read Hildebrandt's lips because B. lost a significant amount of her hearing. B. could not concentrate and her balance was off. Hildebrandt took B. to doctor appointments about four times a month for about a year. Reading became difficult for B. B. "used to like to draw a lot and do sketching and stuff, and when she would try to print or write something, it's like the letters either went backwards or—it's like the brain didn't work like with her hands, and she was good at printing and things before, and now she was having difficulty doing that." Further, the attack resulted in B. having numbness in her hands and difficulty sitting or standing for a long period of time.

We now address defendant's contention that the court's ruling denied defendant the right to the effective assistance of counsel under the Sixth and Fourteenth Amendments of the federal Constitution and Article I, section 15 of the California Constitution. The "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. [Citations.]" (*Strickland v. Washington*, *supra*, 466 U.S. at p. 686.) The Sixth Amendment right to effective assistance of counsel is extended to a defendant in a state criminal prosecution through the Fourteenth Amendment. (*Gideon v. Wainwright* (1968) 372 U.S. 335, 341.) Defendant has not cited any case in which a trial court's refusal to allow defense counsel to make an opening statement prior to the presentation of the prosecution's case-in-chief resulted in the denial of the right to effective assistance of counsel. Our research has not disclosed any either.

14

In *United States v. Salovitz* (2d Cir. 1983) 701 F.2d 17, the defendant argued that an "opening statement was an essential component of his constitutional right to trial by jury and to the effective assistance of counsel." (*Id*. at p. 19.) The appellate court rejected the contention, holding "a defendant's unfettered right to make an opening statement, unlike his right to make a closing argument, is not one of the 'traditions of the adversary factfinding process that has been constitutionalized by the Sixth and Fourteenth Amendments.'" (*Id*. at p. 19, quoting *Herring v. New York* (1975) 422 U.S. 853, 857.) At the time of the drafting of the Sixth Amendment, "there was no settled body of English law concerning opening statements to which the framers of our Constitution could look . . . ." (*United States v. Salovitz*, *supra*, 701 F.2d at p. 19.) In addition, the *Salovitz* court found the states were not uniform in their treatment of when the defense may make an opening statement (*id*. at pp. 19-20, fns. 1-4) and there were no federal statutes or rules of procedure pertaining to a criminal defendant's opening statement. (*Id*. at p. 20.) The court concluded the Constitution does not guarantee the defendant an opening statement and a trial court may, in its discretion, determine "the making and timing of opening statements." (*Id*. at p. 21; see also *Hyde v. State* (Ala.Crim.App. 1998) 778 So.2d 199, 236 [defendant's constitutional rights not violated when trial court refused to permit counsel to make opening statement at close of prosecution's case]; *Moore v. State* (Tex.Crim.App. 1993) 868 S.W.2d 787, 789 [no constitutional right to make opening statement].)

*Brooks v. Tennessee* (1972) 406 U.S. 605 does not compel a different result. In *Brooks*, pursuant to a state statute, the trial court required the defendant to testify before the presentation of other defense witnesses or to forego the right to testify. (*Id*. at p. 606.) The United States Supreme Court held the statute violated the Constitution in that it placed a penalty on the defendant's right to remain silent until such time as he chooses to speak (*id*. at pp. 609-610), and because it interfered with "an important tactical decision as well as a matter of constitutional right," to testify or not.

15

(*Id*. at p. 612.)  Requiring the defendant to be the first defense witness or to surrender the right to testify, deprived the defendant "of the 'guiding hand of counsel' in the timing of this critical element of his defense."  (*Id*. at pp. 612-613.)  *Brooks* is based on the defendant's exercise of a constitutional right.  However, as stated above, a criminal defendant does not have a constitutional right to make an opening statement.  Accordingly, we find the court's ruling did not violate defendant's right to counsel.

C.  *Assault with Force Likely to Cause Great Bodily Injury as Lesser Included Offense*

The trial court has a sua sponte duty to instruct on a lesser included offense "if the evidence has raised 'a question as to whether all the elements of [the charged greater offense] were present and if there was evidence that would have justified a conviction of the lesser offense.' [Citation.]"  (*People v. Friend* (2009) 47 Cal.4th 1, 51.)  Defendant argues his conviction must be set aside because the court did not instruct on the crime of assault with force likely to cause great bodily injury (former § 245, subd. (a)(1)),[2] which he asserts is a lesser included offense of torture.  The same argument was made and rejected in *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1456.

"An uncharged offense is included in a greater charged offense if *either* (1) the greater offense, as defined by statute, cannot be committed without also committing the lesser (the elements test), *or* (2) the language of the accusatory pleading encompasses all the elements of the lesser offense (the accusatory pleading test).  [Citations.]"  (*People v. Parson* (2008) 44 Cal.4th 332, 349.)  Torture requires (1) the defendant to inflict great bodily injury on another, (2) "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."  (§ 206;

---

[2] That portion of former section 245, subdivision (a)(1) describing the crime of assault with force likely to cause great bodily injury was renumbered section 245, subdivision (a)(4) by Stats. 2011, chapter 15, section 298, operative January 1, 2012. (47C West's Ann. Pen. Code (2013 Cum. Pocket Part) § 245, pp. 118-119.)

16

see CALCRIM No. 810.) Assault with force likely to cause great bodily injury in violation of former section 245, subdivision (a)(1) requires the defendant to have (1) assaulted another (2) with force likely to have cause great bodily injury. (Former § 245, subd. (a)(1).) Assault with force likely to cause great bodily injury fails the elements test because torture can be committed without assaulting the victim. "For example, a caretaker would be guilty of torturing an immobile person in his care if the caretaker, acting with the intent to cause extreme suffering for a sadistic purpose, deprived that person of food and water for an extended period of time, resulting in great bodily injury to the person. In such a circumstance, the caretaker would have inflicted great bodily injury without using any force and thus would not be guilty of committing assault by means of force likely to produce great bodily injury. Because the use of force is not a necessary element of the crime of torture, assault by means of force likely to produce great bodily injury is not a lesser included offense of torture." (*People v. Hamlin*, *supra*, 170 Cal.App.4th at p. 1456.)

The result is the same under the pleading test. Count two of the information alleged defendant violated section 206 in that defendant "with the intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, and for a sadistic purpose, did unlawfully inflict great bodily injury, as defined in . . . section 12022.7, upon [B.]" When the information does no more than plead a charge in the language of the statute, the pleading test does not differ from the elements test. The information did not allege defendant tortured B. by assaulting her. And, as we have already concluded, one need not assault another to be guilty of torture. (*People v. Hamlin*, *supra*, 170 Cal.App.4th at p. 1456.)

We agree with the analysis in *Hamlin*. Assault with force likely to cause great bodily injury does not qualify as a lesser included offense of torture in this case under the elements test or the pleading test. Accordingly, we find the trial court did not err in refusing to instruct the jury on assault with force likely to cause great bodily injury.

17

D. *Motive Instruction*

The court instructed the jury pursuant to CAJIC No. 2.51, as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." Defendant contends the crime of torture requires the defendant's actions to have been motivated by a sadistic purpose. CALJIC 2.51 is a correct statement of the law. (*People v. Howard* (2008) 42 Cal.4th 1000, 1024.) Additionally, the same argument was rejected by in our brethren in the Third Appellate District. (*People v. Hamlin*, *supra*, 170 Cal.App.4th at p. 1452.) The California Supreme Court rejected a similar argument in connection with a charge of murder by torture (§§ 187, 189, 190.2, subd. (a)(18) [murder involved the infliction of torture]). (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 218.) If motive is not an element of murder by torture (*ibid.*), it follows that motive is not an element of torture. (*People v. Hamlin*, *supra*, 170 Cal.App.4th at p. 1453 ["no principled basis on which to distinguish between the crime of torture and the crime of murder by torture on this point"].)

III

DISPOSITION

The judgment is affirmed.

MOORE, J.

I CONCUR:

O'LEARY, P. J.

18

Bedsworth, J., concurring:

I respectfully concur. I agree with my colleagues' analysis on every point save one. I write solely to express my minor disagreement on that point, which does not affect the outcome of the case.

The majority finds the trial judge abused his discretion in ordering the defense opening statement to be deferred until after the prosecution's case. The error is deemed harmless, a conclusion in which I heartily join – especially since defense counsel ended up waiving an opening statement. But I part company with the majority in finding any error at all in that deferral.

As my colleagues recognize, Penal Code Section 1093 provides the order of proceedings to be followed in a criminal trial. It provides for an opening statement by the defense after the prosecution's opening statement or after the close of the prosecution case, at the option of the defense. But Section 1094 sets out an exception to that rule: "When the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the court, the order prescribed in Section 1093 may be departed from."

In this case, the court determined a defense opening statement after the prosecution's would be problematic because it would include reference to witnesses who were to be called to impeach the *anticipated* testimony of the victim. Because he had no way of knowing what that testimony would actually be – nor did the defense – the trial judge decided to defer opening statement until *after* that testimony had been received.

That strikes me as precisely the kind of "good reason" the statute refers to. And whether we would have come to that conclusion or not, I think we exceed our mandate in finding it to be an abuse of the trial court's considerable and statutorily explicit discretion in conducting a trial.

The disapproval of my colleagues seems to be expressed in their statement, "It is too late for defense counsel to remind the jury to keep an open mind during the

1

presentation of the evidence once the evidence has already been admitted." But the problem with that contention is in the word "remind." The jury had already been *told* to keep an open mind. They were given Penal Code section 1122 and CALJIC No. .50 and locked in the jury room until they had finished reading them.

Penal Code section 1122 includes in its many admonishments the order that they form no conclusion about the case until it is finally submitted to them. And CALJIC No. 50 repeats that admonition, tells them not to decide how they would vote and tells them in no uncertain terms, "During the course of this trial and before you begin your deliberations, you must keep an open mind on this case and upon all of the issues that you will be asked to decide. In other words, you must not form or express any opinions on this case until the matter is finally submitted to you."

So all the trial judge denied the defense here was the opportunity to *remind* the jurors of this admonition. That just seems to me an awfully slender reed on which to hang an abuse of discretion finding.

BEDSWORTH, J.

2