Filed 4/23/14  P. v. Morales CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TOMAS ROBERT MORALES,<br><br>        Defendant and Appellant. | A137667<br><br>(Contra Costa County<br>Super. Ct. No. 51100312) |

### INTRODUCTION

Defendant Thomas Roberto Morales appeals from his conviction of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a))[1] and violation of a court order (§ 273.6, subd. (a)).  He contends the trial court erred in instructing the jury on flight and failing to hold a competency hearing prior to sentencing under section 1201.  We affirm.

### BACKGROUND

We set forth the facts only to the extent necessary to address the issues on appeal.  Defendant and Frances Navarro were in a romantic relationship.  On May 22, 2010, Navarro's jaw was broken.  The description given by a police officer who saw her was that "half of her face was hanging a couple inches below the other half of her face."

Navarro testified her jaw was broken in a store parking lot near her home in Pittsburgh.  She "t[ook] a step out of [her] car" and felt "an impact, kind of like, you know, getting hit" in her face.  She claimed she did not see who or what hit her.  She did

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

not "remember anybody around [her] at all." "[Q]uite a bit of blood" was coming from her mouth area. She did not seek help, but instead drove home. She claimed defendant was there when she arrived and she told him to leave because he wanted her car keys to look for the person who had injured her. Defendant left. Defendant's sisters then drove Navarro to the hospital.

Navarro's sister, Mercedes Navarro, testified Navarro's 13-year-old son called her and said defendant hit his mother and she was in the hospital. Mercedes also testified that when Navarro was at the hospital, she told Mercedes defendant hit her in the mouth. Mercedes relayed this information to a police officer who came to the hospital. Navarro became upset with her sister, because she did not want defendant to go to jail.

Navarro's son also told a police officer his mother said defendant had hurt her jaw. At trial, he testified he lied to the officer, and also had not told his aunt that defendant hit his mother. Navarro testified she never told her son defendant hurt her.

The Contra Costa District Attorney charged defendant by information with inflicting corporal injury on a cohabitant (§ 273.5, subd. (a)), assault by force likely to cause great bodily injury (§ 245, subd. (a)(1)), battery causing serious bodily injury (§§ 242, 243, subd. (d)), and violation of a court order (§ 273.6, subd. (a)). As to the first two charges it was also alleged there was infliction of great bodily injury (§ 12022.7, subd. (e)). The information further alleged defendant had two prior strike convictions (§§ 667, subds. (b)–(i), 1170.12), served two prior prison terms (§ 667.5, subd. (b)), and was ineligible for probation (§ 1203, subd. (e)(4)).

Defendant pleaded guilty to violation of a court order. A jury found then found him guilty of inflicting corporal injury on a cohabitant and also found the great bodily injury enhancement allegation true. No verdict was returned on the remaining charges because the court instructed those were alternative charges which the jury did not need to reach if it found defendant guilty of inflicting corporal injury. The court, in turn, found defendant had one prior strike conviction and had served three prior prison terms.

The court granted defendant's request that Dr. Mary Kim, a psychologist, interview him in preparation for sentencing. On the date set for the sentencing hearing,

2

the court stated "I consulted with both counsel some time ago when I was advised by [defense counsel] that he'd had a medical examination of his client, that [defendant] appeared psychotic, that perhaps the matter belonged under section 1201 of the Penal Code." The court, accordingly, appointed a psychiatrist, Dr. Martin Blinder, to examine defendant. Following review of his report, the court determined there was "not reasonable cause to believe that the Defendant is 'insane' " under section 1201.

Defendant filed a writ petition in this court, and we ordered opposition and stayed pronouncement of judgment. After opposition was filed, we denied the petition and dissolved the stay.[2] The trial court then sentenced defendant to a total term of seven years.

## DISCUSSION

### *The Flight Instruction*

Defendant contends the trial court erred in instructing the jury on flight as evidence of awareness of guilt.

Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." (§ 1127c.)

---

[2] In conjunction with this appeal, defendant has filed a request for judicial notice of Dr. Kim's report and a February 25, 2004, Atascadero State Hospital (Atascadero) physician's report, which were attached as exhibits to his writ petition. We ordered the superior court to forward to this court and to counsel a copy of Dr. Kim's report and the Atascadero report. The superior court clerk declared no report of Dr. Kim was in the court's file, but forwarded the Atascadero report, which is part of the record on appeal. Because Dr. Kim's report is not part of the trial court record, we deny the request for judicial notice. (Evid. Code, § 452, subd. (d).) Since it is already part of the record, we deny the request as to the Atascadero report as moot.

"The giving of such an instruction is statutorily required when flight evidence is relied upon by the prosecution." (*People v. Howard* (2008) 42 Cal.4th 1000, 1020.) "The instruction is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt. (*Ibid*.)

Defendant asserts there was "insufficient evidence to justify giving the flight instruction," relying on *People v. Crandell* (1988) 46 Cal.3d 833, 869 (*Crandell*), abrogated on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365. In *Crandell*, the defendant left a house where he had killed two people. "Defendant did not leave to avoid being observed . . . and he did not expect the crimes to become known before his intended return. He left to accomplish specific tasks and with the intent of returning to dispose of the bodies. There is no evidence he ever wavered in this intent; indeed, he was arrested while returning and less than a block from the P. house." (*Id*. at pp. 869–870.) Because "his leaving was not flight in the absence of any evidence from which a jury could reasonably infer that he left to avoid being observed or arrested" the instruction on flight was error. (*Id*. at p. 869.)

In this case, defendant left the premises within minutes of becoming aware Navarro had a broken jaw. He asked his stepfather, José Parra, for a ride to the BART station, telling him he was going to Walnut Creek. Parra drove defendant to the BART station, and described him as "kind of upset, but I don't know why. I ask[ed] him why and he did not say." This contrasted with Navarro's claim that she "made" defendant leave "a minute or two" after she returned home with a broken jaw because he "wanted the keys to go back" to look for whoever had broken her jaw, allegedly in a Pittsburgh parking lot. Navarro also testified she had surgery and was in the hospital for five days, and admitted defendant never visited her. Thus, there was sufficient evidence defendant left as soon as he realized the extent of Navarro's injuries (and then stayed away), justifying the instruction on flight.[3]

---

[3] Defendant notes the trial court acknowledged there was no evidence he knew he was being accused. The flight instruction is to be given, however, where there is evidence of "flight of a person immediately after the commission of a crime, *or* after he

4

Defendant also contends the flight instruction was argumentative and allowed the jury to draw impermissible inferences.  The California Supreme Court has repeatedly rejected this contention.  " 'The instruction informs the jury that it may consider flight in connection with all other proven facts, giving the fact of flight the weight the jury deems appropriate.  [Citation.]  The instruction is not argumentative; it does not impermissibly direct the jury to make only one inference.' "  (*People v. Howard* (2008) 42 Cal.4th 1000, 1021, quoting *People v. Mendoza* (2000) 24 Cal.4th 130, 180–181.)[4]

***"Insanity" Under Penal Code Section 1201***

Defendant maintains the trial court also erred in finding no reasonable ground for believing him to be "insane" under section 1201 after trial but before sentencing, and therefore not holding a competency hearing prior to sentencing.

A defendant may raise the issue of his or her sanity after his conviction, before sentencing.  "When the defendant appears for judgment he must be informed . . . of the nature of the charges against him and of his plea, and the verdict, if any thereon, and must be asked whether he has any legal cause to show why judgment should not be pronounced against him."  (§ 1200.)  Section 1201 provides in part "He or she may show, for cause against the judgment:  (a) That he or she is insane; and if, *in the opinion of the court, there is reasonable ground for believing him or her insane*, the question of insanity shall be tried *as provided in Chapter 6* (*commencing with Section 1367*) . . . ."  (§ 1201, subd. (a), italics added.)

"When the court is presented with substantial evidence of present mental incompetence, the defendant is entitled to a section 1368 hearing as a matter of right . . . ."  (*People v. Mayes* (1988) 202 Cal.App.3d 908, 915.)  "If, upon the trial of that question, the jury finds that he or she is sane, judgment shall be pronounced, but if they

---

has been accused of a crime that has been committed . . . ." (§ 1127c.) Defendant fled immediately after commission of the crime, warranting the instruction.

[4] Because there was no error in instructing the jury on flight, we do not reach the issue of whether any error was prejudicial.

find him or her insane, he or she shall be committed to the state hospital for the care and treatment of the insane, until he or she becomes sane . . . ." (§ 1201, subd. (a).)

Section 1367 sets forth the test for mental incompetency. It provides in part: "A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. [¶] (b) Section 1370 shall apply to a person who is charged with a felony and is incompetent as a result of a mental disorder. . . ." (§ 1367, subds. (a)–(b).) Section 1370, in turn, provides: "If the defendant is found mentally incompetent, the trial or judgment shall be suspended until the person becomes mentally competent." (§ 1370, subd. (a)(1)(B).)

In the trial court, defendant claimed a determination of "insanity" under section 1201 must be made using the same standard employed in determining whether a defendant is not guilty by reason of insanity (§ 25, subd. (b)).[5]

The Penal Code, however, "uses the words 'insane' and 'insanity' in different senses. A defendant may plead that 'he is not guilty of the offense charges because he was insane at the time . . . .' . . . A similar proceeding is provided if the defendant, as cause against judgment, asserts that he is insane and if 'in the opinion of the court, there is reasonable ground for believing him insane.' (Pen. Code, § 1201.) A person is insane in the sense used in section 1368 if he is incapable of understanding the nature and object of the proceeding against him and of conducting his defense in a rational manner. [Citation.] We think it is in this sense that the word 'insane' is used in section 1367 . . . ." (*People v. Field* (1951) 108 Cal.App.2d 496, 498–499.)

---

[5] Section 25, subdivision (b), provides in relevant part: A defendant may be found not guilty by reason of insanity "only when the accused person proves . . . that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).)

In 1974, the Legislature amended section 1367, changing the previous word choice of "insane" to "mentally incompetent." (Stats. 1974, ch. 1511, § 2, p. 3316.) The bill digest explained "Under California law, there are, in essence, three different types of insanity: (1) present insanity; (2) *McNaughton*[6] insanity; and (3) post-acquittal insanity. . . . [¶] [T]his bill [amending section 1367] deals only with the issue of present insanity. . . . The test of 'present insanity' is: [¶] 'Is the defendant capable of understanding the nature and purpose of the proceedings against him; does he comprehend his own status and condition with reference to such proceedings; is he able to assist his attorney in conducting his defense, or able to conduct his defense in a rational manner?' " (Assem. Com. on Criminal Justice, Ex Post Facto Analysis of Assem. Bill. No. 1529 (1973 Reg. Sess.) June 12, 1973, p. 3.)

Thus, the amendment to section 1367 in 1974, changing the word "insane" to "mentally incompetent," simply acknowledged the test the California Supreme Court had already been applying. Since 1918, the high court had held the test of "insanity" under section 1367 required a "substantial showing to the effect that [defendant's] mind was in such a condition that he did not rightly comprehend his own condition with reference to the proceedings against him . . . or that he was then unable to present in a rational manner any defense that he might have either on a motion for new trial or to the pronouncing of judgment." (*People v. Lawson* (1918) 178 Cal. 722, 727 (*Lawson*); see also *People v. Field, supra*, 108 Cal.App.2d at pp. 498–499.)

Nevertheless, the trial court here adopted its own standard, concluding: " 'For the purposes of this proceeding, a person is deemed to be insane if that person is so irrational as to be unable to generally comprehend the nature of his or her surroundings, including an understanding as to the purposes of placement in a penal institution. Amongst factors that may be considered in reaching this determination are: [¶] 1. whether the person understands that he or she has been convicted of a crime and of what conduct he or she was charged with; [¶] 2. whether, in everyday circumstances, he or she knows the

---

[6] *McNahton's Case* (1843) 8 Eng. Rep. 718, 722.

7

difference between right and wrong; [¶] 3. whether the person is a danger to himself or to others; [¶] 4. whether, if placed in a correctional institution, he or she would not be able to deal with daily necessities such as eating, bathing, sleep management and following simple instructions.' " Applying this standard, the court determined there was "not reasonable cause to believe that the Defendant is 'insane.' "

While defendant complains the trial court applied an incorrect standard, he no longer advocates the test of "insanity" utilized under section 25. He now concedes that, under section 1201, the courts apply the competency test of section 1367, asserting "California courts . . . have examined . . . the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of the defense in a rational manner."

There is no question the trial court applied a standard not found in the relevant statutes or cases, perhaps due to defendant's erroneous urging that it apply the insanity test of section 25. Nevertheless, the standard employed by the trial court essentially included the section 1367 competency test, plus several additional requirements more favorable to the defendant. Accordingly, the court's utilization of a standard different from that set forth in section 1367 was harmless error.

The court found no reasonable ground for believing defendant was mentally incompetent based largely on the reports of Dr. Blinder.

Dr. Blinder initially reported defendant was a "reasonably articulate individual who comprehends all questions and replies with apparent candor. [¶] [He] is oriented to time, place and person, and is alert to his surroundings. There are no hallucinations or illusions." Defendant's "narrative is logical and coherent; it is its content[] that is delusional." He "underst[ands] that the proper role of his attorney would be 'to defend you,' and the prosecutor 'puts people away,' but the judge and jury, though theoretically even-handed, were in fact contaminated by the evil forces arrayed against him." He understood the sentence he was facing, but believed he " 'should be free.' " Dr. Blinder opined defendant was psychotic and his "delusions prevent him from perceiving the

8

justness of the verdict leveled against him. He will require antipsychotic medications to restore his sanity."

The court then asked Dr. Blinder to " 'address the issue of whether the defendant should be committed to a state hospital for treatment in lieu of confined to prison.' " Dr. Blinder responded he "believe[d] this query extends beyond my narrow purview as a psychiatrist." He noted defendant "can certainly receive the treatment he requires during his incarceration. Arguably, this treatment might be 'better' if administered in a mental hospital, and no one would dispute that the setting for that treatment would be far more pleasant than that received in prison. But quite frankly, the clinical outcome would probably be the same irrespective of the setting in which it was received."

Dr. Blinder's examination and report do not raise a doubt about whether defendant was competent under section 1367. Defendant quite clearly understood the nature and object of the proceeding against him. That he disagreed with "the justness of the verdict" does not distinguish him from competent defendants. Moreover, Dr. Blinder did not opine that defendant was unable to assist counsel in conducting his defense in a rational manner. In addition, the trial court had the benefit of its own observations of defendant during trial.[7] (See *People v. Ramos* (2004) 34 Cal.4th 494, 508 ["a defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel"].) As in *Lawson*, the fact defendant "was not perfectly poised mentally may be freely conceded. Such, however, is not the test." (*Lawson, supra,* 178 Cal. at p. 727.)

---

[7] The Atascadero report does not assist defendant with respect to his competency at the time of sentencing, since it describes defendant's behavior and mental state nearly a decade earlier, in 2004.

**DISPOSITION**

The judgment is affirmed.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.