Filed 6/19/14  P. v. Fletcher CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY WAYNE FLETCHER,<br><br>    Defendant and Appellant. | D063230<br><br><br><br>(Super. Ct. No. RIF154250) |

APPEAL from a judgment of the Superior Court of Riverside County, Bernard J. Schwartz, Judge.  Affirmed.

Law Offices of Russell S. Babcock and Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Scott C. Taylor and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Defendant Anthony Wayne Fletcher appeals from a judgment of conviction for three counts of lewd acts on a child aged 14 or 15 and 10 years younger than Fletcher, and three counts of annoying or molesting a child under age 18. The victim was Fletcher's daughter, whom he touched on a number of occasions when he thought she was sleeping.

On appeal, Fletcher contends that the trial court erred in instructing the jury with an instruction on flight. According to Fletcher, there was no evidence from which a rational juror could reasonably infer that Fletcher left Riverside County in order to elude arrest or observation, and that the flight instruction therefore should not have been given. We conclude that the trial court did not err in instructing the jury on flight, and that even if the court erred in giving the instruction, Fletcher cannot demonstrate that the instruction prejudiced him. We therefore affirm Fletcher's convictions.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Factual background*

Until her freshman year of high school, Jane Doe[1] lived with her mother and father in Riverside County. She considered her family to be "the basic American dream-

---

[1]      In the trial transcript, Fletcher's daughter is referred to as "Jane Doe."

type family." When Doe was 15 and her body started maturing, Fletcher, her father, began molesting her.

According to Doe, Fletcher would enter her bedroom early in the morning, pull down the covers, reach under her clothing and fondle her breasts and, sometimes, her buttocks. Doe would pretend to be asleep while this was happening. In response to Fletcher's conduct, Doe began wearing a sports bra to bed. She thought that because the sports bra was tight, it might prevent Fletcher from "going skin-to-skin," but Fletcher continued to fondle her breasts by lifting up the sports bra. Doe assumed that Fletcher did not realize that she was aware of what he was doing to her because she pretended to be asleep.

Doe did not tell anyone about the molestation because she did not want to break up her family. She "chose to act like everything was okay" so that she would not disrupt the family. Doe estimated that Fletcher molested her between 40 and 100 times over a period of a year and a half.

Doe first disclosed the fact that Fletcher was molesting her to her best friend, T.D., on October 12, 2009. T.D. also disclosed a personal secret to Doe that day. Doe told T.D. not to tell anyone about the molestation because at that time Doe still wanted to protect her family.

The night after Doe disclosed her secret to T.D., Doe's mother listened to a voicemail message on Fletcher's work cell phone. The message had been left by a woman who referred to Fletcher as her boyfriend in the message. At the time Doe's

3

mother listened to the voicemail, Fletcher was out of town for work training. Doe's mother called Fletcher's father, who was also the family's church pastor, and asked him to come over to listen to the voicemail message. Fletcher's father came over to the family's house that night. After he listened to the voicemail message, he and Doe's mother called Fletcher. When Doe's mother spoke with Fletcher that night, Fletcher became upset with her for telling his father about the voicemail message. Fletcher ended the conversation by telling Doe's mother that when he returned from his training, "it would be [Doe] and [her], and he was gone."

While Fletcher's father was at the family's house that night, Doe overheard her mother telling Fletcher's father about the voicemail and her belief that Fletcher "was cheating again." Doe became upset, began "freaking out," and thought that her parents might get divorced. Doe called T.D., who attempted to calm Doe down by telling her to wait to talk with her mother about the situation.

When Doe's mother spoke with Doe, she told her that she planned to stay with Fletcher so that Doe would have "a father figure around still." Doe decided to tell her mother about the molestation. She told her mother that Fletcher had been coming into her bedroom and touching her breasts while he thought she was asleep. At trial, Doe explained that she decided to reveal the molestation to her mother because she had realized that "this family that I was trying to protect wasn't really what I thought it was."

Upon learning about the molestation, Doe's mother called Fletcher's father, who had already left the house. She related to Fletcher's father what Doe had told her.

4

Fletcher's father called Fletcher, but did not mention what Doe had revealed. Instead, he told Fletcher that his wife "was very upset about some issues," and that it would be better if Fletcher came to his father's house and stayed there upon his return on October 16.

On the morning of October 14, Doe's mother called a lawyer to begin divorce proceedings and to obtain a restraining order against Fletcher. Doe's mother did not think that calling the police was an option because Fletcher was a police officer. That night, Doe's mother told Fletcher's father that she had contacted an attorney, was seeking a divorce, and had obtained a restraining order.

Fletcher returned from his trip on October 16, arriving at his father's house around 9:30 or 10:00 p.m. Fletcher's father asked him if he had been involved "with touching" Doe. Fletcher denied having touched Doe "in any way." Fletcher's father told him that "there was supposed to be somebody here at the house to give you a restraining order." Fletcher was upset. He said, "I need to get out of here. I need to go."

At 10:35 p.m. that night, Fletcher left the following voicemail message for his supervisor, Sergeant Russell Shubert, at the Riverside Police Department: "Russ, this is [Fletcher]. It's 10:30 at night, on uh, Friday night. I know this is late notice, and I do apologize. Effective immediately, I no longer work for the Riverside Police Department. I resignate [*sic*] immediately. I turn in my resignation. I don't have time for it to be two weeks. I wish I could give you more details, but unfortunately, I'm in a little bit over my head right now. Nothing criminal, but I'm having some family problems and I need to

5

leave for a while. Um, I will call you back next week and let you know what's going on. I deeply—I thank you very much for all that you've done for me, and please pass that on to Cliff and John, and um, you guys have been most wonderful, and I just thank you for that. Uh, I will talk to you after awhile. Bye."

Sergeant Shubert received a second voicemail message from Fletcher the following morning. In the second message, Fletcher asked Shubert to disregard his message from the previous night, but also said that he was "leaving the area." After listening to that message at around 8:30 a.m., Shubert called Fletcher's cell phone. Fletcher answered. Shubert testified that it sounded like Fletcher was driving. Fletcher told Shubert that he was in northern California, in or near Tulare County. Fletcher said that "there had been some issues at his house involving his wife and his daughter and that he was leaving and he was going up to Reno, Nevada." Shubert inquired about what was going on, and Fletcher replied that "it was just problems with his family, and he needed to leave." It "sounded" to Sergeant Shubert as if Fletcher "was going to be gone an extended period of time, and he wasn't coming back." Shubert talked with Fletcher, and Fletcher eventually agreed to come back to Corona. Fletcher returned to his father's home at around 3:00 or 4:00 p.m. that day.

On October 19, Fletcher was served with a temporary restraining order. Instead of opening it, Fletcher handed it to a police sergeant and turned in his badge and firearm.

In February 2010, Fletcher was speaking with three Riverside police officers and the topic of the case against him came up. During that conversation, Fletcher said that

6

"maybe [Doe] had misconstrued something." The only thing he could think of was "that when he would work late at night, he would come home and check on her by placing his hand on her chest to see if she was breathing." Detective Roberta Hopewell, who participated in that conversation, had been unaware of the details of the allegations against Fletcher, but his comment about checking on his daughter "kind of struck [her] strangely." During that conversation, Fletcher also mentioned that "he thought he would be going to prison, but it was God's will, and he could minister to the prisoners."

Fletcher admitted in a prior proceeding that Doe and T.D. were honest, and that he was not. In that proceeding, he denied having made the statement to Detective Hopewell about checking on his daughter's breathing by putting his hand on her chest.

B.     *Procedural background*

In October 2010, a jury found Fletcher guilty of molesting Doe. The trial court sentenced Fletcher to five years of formal probation, with the condition that he serve 365 days in county jail. A year later, this court reversed the judgment against Fletcher on the ground that the trial court had erred in admitting certain evidence.

Fletcher was retried, and in November 2012, a second jury found Fletcher guilty of committing three counts of lewd acts on a child aged 14 or 15 and 10 years younger than Fletcher (Pen. Code, § 288, subd. (c)(1)), and three counts of annoying or molesting a child under age 18 (Pen. Code, § 647.6, subd. (a)). The trial court again sentenced Fletcher to five years of formal probation with the condition that he serve 365 days in

7

county jail. The trial court gave Fletcher credit for time served and for time spent on probation.

Fletcher filed a timely notice of appeal.

III.

DISCUSSION

A. *The trial court properly instructed the jury with respect to flight because there was sufficient evidence from which a juror could reasonably infer that Fletcher left to avoid arrest or observation.*

Fletcher contends that the trial court erred in giving the jury an instruction on flight, arguing that the evidence did not support giving the instruction.

1. *Additional background*

The People requested that the trial court instruct the jury with CALCRIM No. 372, the standard jury instruction regarding a defendant's flight. Defense counsel objected to the court giving a flight instruction, arguing, "I don't think the evidence has shown sufficiency [*sic*] to show flight, that he's actually fleeing, and I'll submit on that." In response, the trial court said, "I think there is sufficient evidence in that clearly after the allegations are told to him by his father. There is conduct which appears to be—his driving, whether it be to Tulare, or his intent to go to Reno, or wherever, but, nonetheless, there was a driving away and also a phone call of resignation indicating—at least at that point the intent not to return. [¶] The instruction talks about fled or tried to flee, so I think it does go to consciousness of guilt."

The trial court instructed the jury regarding flight as follows:

8

"If the defendant fled or tried to flee immediately after the crime was committed, or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

The trial court also instructed the jury as follows: "Some of these instructions may not apply depending on your findings about the facts in the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are in this case, follow the instructions that do apply to the facts as you find them."

2.      *Legal standards*

The trial court has a statutory obligation to instruct the jury on flight whenever the prosecution relies on evidence of flight as tending to show guilt:

"In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows:

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine.

"No further instruction on the subject of flight need be given." (Pen. Code, § 1127c; *People v. Mendoza* (2000) 24 Cal.4th 130, 179.)

The trial court properly gives a flight instruction " 'whenever evidence of the circumstances of [a] defendant's departure from the crime scene or his unusual

9

environs . . . logically permits an inference that his movement was motivated by guilty knowledge.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 470.) The "instruction is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt." (*People v. Howard* (2008) 42 Cal.4th 1000, 1002.)

"In this context, flight 'requires neither the physical act of running nor the reaching of a faraway haven' but it does require 'a purpose to avoid being observed or arrested.' [Citations.] 'Mere return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the circumstances of departure from the crime scene may sometimes do so.' [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 126, italics omitted.)

We review de novo the propriety of the giving of a jury instruction. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Further, we apply the harmless error standard provided in *People v. Watson* (1956) 46 Cal.2d 818, 836, in reviewing an error in giving the flight instruction. (*People v. Silva* (1988) 45 Cal.3d 604, 628.)

3. *Analysis*

a. *There was no error*

After reviewing the evidence, we conclude that the trial court properly instructed the jury with the instruction on flight. The jury could have reasonably concluded that Fletcher immediately fled the county to avoid arrest or observation upon being made aware of the accusation against him. Specifically, when Fletcher's father told him that his daughter had said that Fletcher had touched her inappropriately, Fletcher stated, "I need

10

to get out of here. I need to go." A few minutes later, Fletcher called his supervisor and indicated that he was resigning from his position "immediately" and that he had to leave. Fletcher then got into his vehicle and began driving north. By the following morning, he was already approximately 200 miles away from his home. When he spoke with his supervisor that morning, he said that he was headed even farther away. Although Fletcher decided to return home after additional discussion with his supervisor, the fact that Fletcher immediately left the county upon hearing what his daughter had said is sufficient evidence from which a jury could infer that Fletcher's flight reflected a consciousness of guilt.

On appeal, Fletcher argues that "the only reasonable inference [from the evidence] is that appellant drove to Tulare, California, to visit his mother." Although Fletcher did refer to the fact that his mother lived in Tulare County during his conversation with his father, this does not mean that the only reasonable inference from Fletcher's conduct is that he was heading to Tulare County to visit his mother. Fletcher did not tell anyone where he was going, and the following morning when he spoke with his supervisor, he indicated that he might be headed to Reno, Nevada. Although the jury could have concluded that Fletcher was going to Tulare County to visit his mother, there were enough other circumstances about his leaving Riverside County, including the fact that he left in the middle of the night almost immediately after discovering that his daughter had accused him of molesting her, and that he attempted to resign from his job, from which the jury could have concluded that he was fleeing to avoid arrest or observation.

11

b. *Even if it were error to instruct on flight, Fletcher cannot demonstrate prejudice*

Although we do not believe that the trial court erred in giving the flight instruction, even if the trial court had erred because there was insufficient evidence to support the inference that Fletcher fled his immediate environs and that this reflected consciousness of guilt, Fletcher could not demonstrate that giving the instruction prejudiced him.

Instructing the jury on flight, even if erroneous, may be "clearly harmless" because "the instruction [does] not assume that flight was established, leaving the factual determination and its significance to the jury." (*People v. Visciotti* (1992) 2 Cal.4th 1, 61.) The very terms of the instruction informed the jury that it first had to decide whether it believed that the defendant actually fled. Only if the jury were to make that preliminary finding would it proceed to decide the significance of that conduct. Further, the instruction benefits a defendant by cautioning the jury that flight, alone, cannot prove guilt. " 'The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.' [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 382, 438-439.) Given the permissive nature of the instruction and its cautionary nature, which benefits a defendant, even if giving of the instruction had been erroneous, Fletcher could not demonstrate that it is reasonably probable that he would have obtained a more favorable verdict if the trial court had not given the instruction.

12

IV.

DISPOSITION

The judgment of the trial court is affirmed.

                                                        _____
                                                                    AARON, J.

WE CONCUR:

_____
        McCONNELL, P. J.

_____
            NARES, J.